**JOSEPH BANCROFT & SONS CO. (a corporation), Plaintiff,**

v.

**SHELLEY KNITTING MILLS, INC. (a corporation), Defendant.**

Civ. A. No. 25092.

United States District Court
E. D. Pennsylvania.

Dec. 27, 1962.

C. Brewster Rhoads, C. Russell Phillips, Arthur H. Moss, Montgomery, Mc·

716

Cracken, Walker & Rhoads, Philadelphia, Pa., Alfred C. Aurich, Synnestvedt & Lechner, Philadelphia, Pa., for plaintiff.

Harry Shapiro, Harold Cramer, Shapiro, Rosenfeld, Stalberg & Cook, Philadelphia, Pa., for defendant.

KRAFT, District Judge.

The nature and earlier history of this action already sufficiently appear in 3 Cir., 268 F.2d 569. After trial to the Court on the merits of the stipulated issues the case is now ripe for decision.

ADJUDICATION

By stipulation of counsel [1], as embodied in the pre-trial order, two ultimate issues are now before us for determination:

(1) Is plaintiff entitled to injunctive relief?

(2) Is defendant liable to plaintiff?

From the admissions, the stipulations of counsel and the evidence in this rather voluminous record we find, as necessary and incidental to the determination of the foregoing issues, the following:

FACTS

Parties;  Jurisdiction;  Trademark; Licensees and Royalties;  Definitions; Personnel;  Contracts

1. The plaintiff, Joseph Bancroft & Sons Co. (hereinafter designated Bancroft), was at all times here material, and still is, a corporation organized and existing under the laws of the State of Delaware, with its principal office in Rockford, Wilmington (99), Delaware.

2. The defendant, Shelley Knitting Mills, Inc. (hereinafter designated Shelley), was at all times here material, and still is, a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal office in Philadelphia, Pennsylvania.

3. The amount in controversy, exclusive of interest and costs, exceeds the sum of $10,000.

4. Jurisdiction of this controversy also exists under the Trademark Laws of the United States.

5. On February 21, 1956, trademark registration No. 621848 was granted to Bancroft upon its application, filed June 2, 1955, for registration in the United States Patent office of the trademark "Ban-Lon" for use on yarn in Class 43. Bancroft has since been and still is the owner of this registered trademark.

6. Ban-Lon yarn is a continuous filament crimped nylon yarn produced by subjecting nylon yarn to Bancroft's crimping process, which imparts a permanent crimp or wave to the yarn, a desirable characteristic for knit outerwear, including ladies' sweaters.

The yarn is made up of a number of filaments. 70 denier 2-ply yarn (as used by Shelley in the manufacture of Ban-Lon interlock sweaters) is made of 2 strands of 70 denier yarn, each strand containing 34 individual filaments.

7. From June 1953 through the times here material Lee W. Rainard was manager of the engineering section of Bancroft's chemical and research products division. His duties included the receipt, implementation and execution of company policies in the fields of fibers and yarn modification and the organization of groups, for which he was responsible, which included, among others, the textile and quality control groups.

8. On April 25, 1955, the KNITTED OUTERWEAR TIMES, a trade journal, published an article written by Rainard, entitled "BAN-LON IN KNIT OUTERWEAR BY LEE W. RAINARD, JOSEPH BANCROFT & SONS, CO." in which the following statement appeared:

"* * * Ban-Lon is a trademark identifying yarns, fabrics, and garments which have been manufactured by methods owned by Joseph Bancroft & Sons Company and which meet the standards established and

1. See document # 93, pp. 3, 4.

controlled by Joseph Bancroft & Sons Company.

\* \* \* \* \* \*

" \* \* \* (b)ut let me tell you what Ban-Lon itself does.

"First because these yarns are made of individually bulked filaments and because there are no free fiber ends, pilling is no longer a factor and can be discounted, thereby allowing freedom to consider any construction. You notice we do not say pill proof. A Ban-Lon garment is pill proof just so long as a large number of filaments are not broken. However under certain conditions of use, let's say where large pendant jewelry has sharp metal points and these rub on the fabric to cause enough filaments to be broken, pills may be formed. This type of wear neither you nor we can control under any circumstances; and, therefore we certainly can't say that under all conditions of use any fabric could be pill proof.

\* \* \* \* \* \*

" \* \* \* We asked a young lady who had purchased a Ban-Lon sweater and then came back for more what she thought of the sweater. Her reaction was instantaneous. 'Why', she said 'I don't know how I got along before. I just throw it in the washing machine, drape it over a line, and put it on in the morning. I really think it gets better looking all the time.' To us that meant that the combination of moisture absorption and softness, freedom from pilling, complete garment stability, that is shrink and stretch resistant, its cling fit, its bulk and lightness, its resistance to moth, mildew and perspiration all added up to a beautiful garment that was extremely easy to live with."

9. The term "pilling" is used generally in the trade to describe a condition resulting from the breakage of individual filaments, the broken ends of which then curl or fuzz up and ultimately form tiny balls, commonly called "pills".

10. Prior to and during 1955 Shelley and its president, John Ashe, had been engaged in the manufacture of sweaters. Ashe had acquired a reputation in the trade as a good and successful sweater manufacturer.

11. Beginning at least as early as 1956 and continuing throughout the period here material, Bancroft granted at least three separate types of licenses:

(a) one type was issued to machinery manufacturers to manufacture machinery for the crimping of continuous filament nylon yarns.

(b) a second type was issued to yarn producers (commonly called "spinners" or "throwsters") to use Bancroft's processes in the production of crimped nylon yarns.

(c) a third type was issued to garment manufacturers and distributors, like Shelley, who manufactured and marketed garments and other products made from nylon yarns crimped by Bancroft's licensed throwsters.

12. Bancroft received royalties from its throwster licensees based on the poundage of yarn crimped under Bancroft's process. It received no royalties from its manufacturer and distributor licensees who produced or marketed the end products.

13. Contemporaneously with the start of its licensing program Bancroft began a quality control program the object of which was to develop and provide very high quality standards for the protection of the ultimate consumer in order to insure a continuing market for garments bearing the Ban-Lon trademark, and so, a continuing demand for nylon yarn crimped by use of Bancroft's royalty-producing process.

14. Following visits by and conferences with Bancroft's Mr. Cooper and Mr. Mersereaux in the early fall of 1955, Shelley entered into a written contract with Bancroft on November 23,

1955, wherein Shelley was given the right to use the trademark "Ban-Lon" upon compliance with the contract conditions which, among others, provided for the submission to Bancroft by Shelley of sample garments:

> "in final form ready for sale, including all labels, tags and descriptive materials which would be either affixed to the garment or on the materials used in wrapping and boxing * * *."

This contract further provided:

> "Once the particular line has been approved for the 'Ban-Lon' Trade Mark, this approval will continue, providing you continue to meet the standards established."

The standards appended to this contract were captioned "TENTATIVE STANDARDS" and, among other things, provided:

> "General examination of the garment in the case of garments, will be made to make sure that the general accepted practice of good fabrication are followed."

They contained no requirement of stitch count.

15. Following execution of the 1955 contract, Shelley discontinued the manufacture of sweaters from other yarns and began to engage exclusively in the manufacture of sweaters from Ban-Lon yarn. In this undertaking Shelley invested substantially in additional equipment, plant space and personnel.

16. On July 24, 1956 Bancroft and Shelley executed another written trademark licensing agreement. This agreement contained provisions that:

> "The testing procedures and the conditions for the use of the trademark 'Ban-Lon' are established and controlled by" Bancroft

The use of the trademark "Ban-Lon" in conjunction with Shelley's trademarks, "Shelley" and "TUNDE", was conditioned upon the submission to Bancroft of a letter of submission, two sample garments of each style, two 18-inch square swatches or equivalent of every color to be offered and designation of certain finished measurements for every style in each size.

The agreement further provided:

> "Once the particular line has been approved for the 'Ban-Lon' trademark, this approval will continue for one year from date of initial trade-mark approval providing you (a) continue to meet the standards established; * * *."

This contract also required the use of the "Ban-Lon" trademark in prominent association with Shelley's trademark.

The "Standard for Knitted Outerwear" appended to this contract provided, among other things:

> "the garment shall show satisfactory workmanship, appearance, hand and shall be satisfactory construction for the type of stitch, yarn size and end use planned based upon the judgment of Joseph Bancroft and Sons Company"; and, further,

> "Garments for outerwear which are made from yarns containing filaments of less than two denier per filament must show a satisfactory level of resistance to fuzzing, pilling and snagging based upon practical use-test comparison. For this reason they require special quality approval from Joseph Bancroft and Sons Company."

The appended standard established no minimum stitch count nor any requirement that garments for outerwear made from yarns containing seventy denier two ply continuous filament crimped nylon yarn must show a satisfactory level of resistance to fuzzing, pilling and snagging based upon practical use-test comparison.

Research on Pilling; Establishment, etc. 28 Stitch Count Minimum Standard

17. During the fall of 1956, Bancroft became aware that fuzzing and pilling was occurring in interlock sweaters made

of Ban-Lon yarn, while the sweaters were being worn by consumers.

Bancroft thereupon undertook to ascertain the causes and, in the course of its research, tested yarns and garments in its laboratory and by actual wear tests. Various alternatives were tested and rejected as causes of the fuzzing and pilling, including the amount of twist in the yarn and the denier or weight per filament of the yarn.

Bancroft also made tests to determine the possible relationship of the stitch count of the garment to the problem. As a result, Bancroft determined in early 1957 that garments having a higher number of stitches per inch showed greater resistance to pilling and fuzzing.

18. Fuzzing and pilling was and is an undesirable characteristic in sweaters and was and is a cause of consumer dissatisfaction.

19. Bancroft, in March 1957, first determined that a minimum count of 28 stitches per inch was necessary to give resistance to fuzzing and pilling on interlock sweaters in service.

20. On April 11, 1957, Bancroft wrote Shelley that

"On the subject of stitch tightness, we have been doing a large amount of laboratory and field consumer testing on interlock sweaters and particularly those made on 16½ Cut machines with 70/2 yarn. We find that in order to have assurance of good service, particularly with regard to pickiness, fuzzing, pilling, stability and resilience, it is necessary to have a somewhat tighter stitch than was considered approvable last year. Your recent submissions which show a finished stitch count of 28 and above are quite satisfactory in this regard. We would caution you not to go below this level. In all future submissions for approval, we will require this tighter stitching for any and all interlock sweaters.

"I'm sure that you will agree with this new requirement as a necessary step in assuring sweaters of a quality level which adequately reflects the fine properties of 'Ban-Lon' yarn."

21. After Bancroft had determined for itself that the stitch count of an interlock sweater was an important factor in its construction, and that a higher stitch count was an effective means of reducing the degree of fuzzing and pilling, it began, in March and April 1957 to notify its licensees of the desirability of increasing the stitch count.

Additionally, Bancroft gave its throwster licensees notice on May 17, 1957 that under paragraph 2 of the "Standard for Knitted Outerwear, product standard SPA–1" attached to their agreements, Bancroft was going to up-grade the requirements for interlock sweaters, in order to improve the wearing qualities in use, in a gradual, step-wise manner to avoid jeopardizing the stability of the "Ban-Lon" market with the sweater manufacturers currently approved and would require it on all new submissions and on re-submissions after the expiration of trademark approvals then effective.

Thereafter, later in May 1957, Bancroft prepared a formal supplement of its standards with respect to knitted outerwear setting forth required minimum stitch counts. This was "product standard SPA–2." This standard included a requirement of 28 stitches per inch as a minimum for interlock outer-garments of 70 denier 2-ply yarn.

On July 1, 1957, Bancroft gave its American and foreign throwster licensees and its experimental licensees, who were fiber producers, written notice of the change in standards as required by the license agreements between Bancroft and those licensees. This notice pointed out that while the standards were immediately effective they were officially binding "according to paragraph 5 of the license agreements of such licensees only after three months from the date of this letter," i. e. October 1, 1957.

Beginning in July 1957 Bancroft also sent "product standard SPA–2" to various licensees engaged in the manufacture of sweaters and had its field service representatives inform such licensees of the new standards.

Between April 11, 1957 and October 1, 1957 Bancroft occasionally approved a sweater with a stitch count of 27 stitches per inch where those garments were, in other respects, satisfactory.

After October 1, 1957 Bancroft approved no sweaters having a stitch count of less than 28 stitches per inch.

22. Bancroft did not make or keep any records of the tests or of the results of the tests upon which its decision to establish the minimum stitch count standard of 28 stitches per inch was based.

23. Bancroft did not consult with or seek the advice of Shelley or of any other sweater manufacturer before establishing the minimum stitch count standard of 28 stitches per inch, though Bancroft had never been and was not engaged in the business of manufacturing or selling sweaters.

24. Shelley had had no experience with the properties of "Ban-Lon" yarn or with the manufacture of sweaters from "Ban-Lon" yarn before it began its manufacture of sweaters from "Ban-Lon" yarn under license from Bancroft.

25. Bancroft's purpose in imposing the standard of a 28 minimum of stitches per inch was to add to the number of stitches then employed by manufacturers a sufficient number of stitches to a minimum of 28 per inch, in order to bind more firmly the yarns and the filaments thereof and to have more binding spots per square inch of fabric and thus to control more tightly the individual filaments in the yarn to reduce their exposure to and capacity for breakage. Another objective of additional stitches was to increase the "coverage" of the yarn, that is the density of the fabric as one might endeavor to look through it. The increase in "coverage" however, could

have been achieved as well by an increase in the number of wales.

26. An increase in the number of wales would not have achieved Bancroft's objective of increasing resistance to fuzzing and pilling which results from the breakage of filaments on the garments' exposed surface by abrasive actions encountered in normal wear by the consumer.

The number of courses per inch depend upon the length of the stitch drawn by the needle. In the interlock stitch the yarn which is on the surface of the fabric is the yarn which forms the inverted U of each of the particular loops which are the stitches. The yarn which is in the direction in which wales are counted, that is horizontal, is in the inner part of the fabric, while the yarn which forms the stitches is the outer surface of the fabric.

27. Since Bancroft's approvals were ordinarily effective for one year from the approval date and since Bancroft, prior to April 11, 1957, issued approvals from time to time as submitted sample styles were approved, Shelley and other of Bancroft's licensees who were Shelley's competitors were manufacturing and selling large quantities of sweaters throughout 1957 with differing stitch counts of less than 28 stitches per inch as well as with stitch counts of 28 or more per inch, all bearing the "Ban-Lon" trademark.

28. Because Bancroft's minimum 28 stitch count standard could not, under its contracts, be made retroactive and applicable to models already approved for a determined period, and because its new standard was applicable to samples thereafter submitted, there was a period of overlap during which Bancroft's licensees were manufacturing and selling sweaters with a "Ban-Lon" trademark which contained less than and more than 28 stitches per inch.

29. During the year 1956 and up to April 11, 1957 Bancroft had approved the manufacture and sale by Shelley of styles of "Ban-Lon" sweaters having

fewer than 28 stitches to the inch which Shelley continued to manufacture until expiration of the respective approvals.

30. All sweaters manufactured by Shelley in conformity with a sample style submitted by Shelley and approved by Bancroft within the effective period of such approval could thereafter be sold at any time by Shelley.

31. After Bancroft adopted the standard of a minimum of 28 stitches per inch it notified all of its licensees of the new standard and each licensee was accorded equal treatment with respect to the applicability of the standard, though the effect on such licensees varied because of the varying expiration dates of the approvals which had theretofore been issued by Bancroft.

32. Sweaters with a minimum stitch count of 28 stitches per inch show greater resistance to pilling and fuzzing during ordinary wear by consumers than sweaters having a stitch count of less than 28 stitches per inch.

33. The stitch count of sweaters affects the amount of yarn used in their manufacture. Illustratively, the amount of yarn which produces 100 sweaters knitted at 28 stitches per inch will produce approximately 111 or 112 sweaters knitted at 25 stitches per inch.

34. Any increase in the use of yarn by Bancroft's licensees in the manufacture of sweaters, which resulted from the imposition of the standard of a minimum of 28 stitches per inch, increased Bancroft's income to the extent of its royalties on any additional poundage of Ban-Lon yarn required by manufacturers to comply with that standard.

35. The number of stitches per inch in an interlock sweater is neither known to or visible to the ordinary consumer.

36. Bancroft's increase in the stitch count to a minimum of 28 stitches per inch minimized but did not completely solve the pilling problem.

On August 9, 1961, Bancroft increased the stitch count for interlock sweaters to 30 stitches per inch.

37. While the increase in stitch count to a minimum of 28 stitches per inch did not become effective on the same day for all licensees, the later increase to a minimum of 30 stitches per inch, adopted August 9, 1961, became effective for all licensees on the same day.

38. Bancroft advertised after April 1957 that "Ban-Lon" sweaters were resistant to fuzzing and pilling.

39. By letter dated August 26, 1957 Bancroft wrote Shelley:

> "Your styles currently being used must come up to our standard minimum stitch count of 28 stitches per inch. Please see enclosed copy of Supplemental Standard for Knitted Outerwear."

This supplemental standard was SPA–2 which provided for a minimum of 28 stitches per inch, finished, for interlock garments which included the sweaters of the type Shelley was knitting. John Ashe, Shelley's President, circulated this among his supervisory personnel.

40. On August 30, 1957 Shelley entered into another written agreement with Bancroft providing for Shelley's right of use of the trademark "Ban-Lon" in conjunction with Shelley's trademarks "Claremont" and "Temi". This agreement was substantially like the agreement of July 24, 1956, and the appended standard did not require a 28 minimum stitch count for interlock outerwear, despite the reference in earlier letters from Bancroft to Shelley to a minimum 28 stitch count standard.

The August 30, 1957 agreement did not supersede the July 24, 1956 agreement. Both agreements were in force at the time Bancroft filed its complaint in this action.

41. The license agreements of July 24, 1956 and August 30, 1957 between Bancroft and Shelley are the same form of standard license agreements entered into between Bancroft and its other sweater manufacturing licensees during the years 1956 through 1958.

42. The written license agreements imposed no obligation on Shelley to use Bancroft's trademark, but provided only the conditions under which Shelley was authorized to use Bancroft's trademark; otherwise Shelley was free to make and sell any kind or quality of sweater and to use any kind of yarn.

43. One effect of both written agreements between Bancroft and Shelley was to constitute an approved sample of a style as the standard for all reproductions thereof for the period during which the approval of the submitted sample was effective.

44. Since the agreements imposed no limit on the time within which Shelley could sell the sweaters it manufactured, and since Shelley had a right to manufacture prototypes of any sample previously approved by Bancroft for one year from the date of approval, other effects of the provisions of these agreements and of later changes by Bancroft in standards which established a minimum stitch count were that Shelley could, without breaching its agreements:

(a) sell at any time sweaters previously manufactured by it conformably to approved samples within the respective effective periods of those approvals, irrespective of Bancroft's standards current at the time of the sale.

(b) continue to manufacture sweaters having a stitch count per inch less than Bancroft's then current standard, provided the sweaters were reproductions of samples previously approved and were manufactured during the respective effective periods of the approvals.

(c) do both (a) and (b) above, while simultaneously manufacturing and/or selling other sweaters made to later, higher standards imposed by Bancroft and the submitted samples of which had been approved.

45. Under date of September 10, 1957, Bancroft wrote Shelley with respect to a number of sample garments submitted by Shelley for approval. Bancroft advised Shelley that the average stitch count of the samples carrying the Shelley label was found to be 28 stitches per inch; that the average in sweaters carrying the "Temi" label was 27, "slightly below standard but close enough to be considered barely passable"; and, that other samples submitted by Shelley for certain jobbers, for whom Shelley was manufacturing, showed averages of 24, 25 and 26 "which are clearly below the minimum standard which we have set up".

46. Prior to October 1, 1957, Bancroft did not have a uniform stitch count standard for interlock sweaters manufactured by its licensees. After October 1, 1957, Bancroft did maintain a reasonably uniform standard of a minimum of 28 stitches per inch. This was not applicable, however, to continuing manufacture of models already approved at a lesser stitch count during the unexpired terms of the periods for which the approvals had been granted.

Quality Control Program

47. Bancroft began to develop, prior to 1955, a licensing and quality control program for the production and distribution of continuous filament crimped nylon yarns and of products manufactured therefrom. The program of licensing and quality control included various levels of production and distribution from licensing of manufacturers of machinery through manufacturers of garments. The latter group included manufacturers and distributors of garments like Shelley, and jobbers who, under their own names and trademarks, sold garments manufactured to the jobbers' specifications by a contract knitter.

Bancroft maintained a research laboratory at its Wilmington plant during the years 1955 through 1958, and there conducted a continuing program of research in an effort to improve the quality of "Ban-Lon" or "Textralized" yarn produced by its crimping processes, and the quality of products manufactured from such yarn as well as the improvement of existing test methods.

48. From 1956 through 1958 Bancroft granted an increasing number of new trademark licenses each year to manufacturers of ladies' sweaters and had granted a cumulative total of 415 licenses by the end of that period. All of the licensees were not active at any one time. Some were relatively small producers of garments bearing the "Ban-Lon" trademark and others were large producers thereof. Some garment licensees actually manufactured and distributed the garments while others, called "jobbers", distributed garments which were knit to their specifications or orders.

49. Contemporaneously with the development of its licensing and quality program, Bancroft, in pursuance of the objectives of that program, set up a quality control group to administer and maintain it. This group or division was responsible for the development of standards for products intended to carry Bancroft's trademark, development of methods for testing and evaluating products, the actual tests and evaluation of products, the approval or disapproval of products and the supervision of its product licensees.

50. The quality control exercised by Bancroft over its machinery licensees included the design and determination by Bancroft of specifications for parts, tolerances, finishes, materials, metals, dimensions and speeds used in the manufacture and operation of the crimping machinery. Machinery manufacturers were required to follow Bancroft's precise specifications and to maintain all of Bancroft's standards with regard to design, components, finish and workmanship of the crimping machine. The purpose of the machinery quality control program was to design and provide machines capable of producing an acceptably uniform crimp continuous filament nylon yarn.

51. Bancroft exercised control over the quality of its licensed "throwster's" products in several ways. Licensed "throwsters" were required to send key personnel to Bancroft's plant to a special school maintained by Bancroft at which they received an intensive course of instruction in the operation of crimping machines. Floor fixers, bench fixers, production supervisors and higher production executives were trained at this school.

"Throwsters" were required to permit inspection of their premises by Bancroft at least semiannually, though the inspections were usually more frequent. Bancroft also required its "throwsters" to submit production samples on a statistically random basis. The submitted samples were tested for crimp level, tensile strength, damage, broken filaments and were given microscopic examination. At least as early as 1956 Bancroft had a written production quality control program and standards for its licensed "throwsters" to which they were required to conform.

52. The quality control exercised by Bancroft over its throwster licensees and over the design of the crimping machines was such that it was highly improbable that yarn would reach a knitter licensee with broken filaments in such number that they could, with any frequency, cause fuzzing and pilling in finished garments.

53. Some time prior to 1955 and thereafter through 1958 Bancroft established and maintained control over the nature and quality of the garments produced and sold by its garment licensees under its "Ban-Lon" trademark. This quality control was exercised by testing and analysing garments in its quality control laboratory, surprise inspections (called "swoops") of licensee's premises and products, purchase of garments at retail, maintenance of a field service group to provide technical assistance, without cost, to garment licensees.

The quality control group was subdivided into several groups: one group worked on improvement of test methods; another group performed actual physical tests on garments submitted by licensees and corresponded with the submitting licensees; another group tested yarn

manufactured by throwsters; another group of field personnel sampled production of all licensees; in addition, some were engaged in the random purchase of garments at retail level for quality determination.

54. From 1956 through 1958 the tests performed by Bancroft on ladies' sweaters submitted for approval included both tests of construction and of performance. Sweaters were examined to determine whether they were made of "Ban-Lon" or "Textralized" yarn; whether they were of proper dimensions for the indicated size; whether proper sewing thread was used; and, at least as early as April 1957 whether they had sufficient degree of stitch tightness for the construction involved. Performance was tested for shrinkage during washing, dyefastness, lightfastness, rubbing or crocking and perspiration staining. The submitted sweaters were inspected as well for "hand" and feel, involving examination for smoothness, drape and overall appearance.

55. After examination and tests indicated the submitted sample sweaters conformed to Bancroft's standards, letters of approval were sent to the submitting licensees. If submitted sample sweaters were found to be sub-standard in any respect letters were sent to the licensees advising that the styles submitted were not approved for use with the "Ban-Lon" trademark, stating the reasons for rejection coupled with the request for re-submission of other samples of the styles.

56. In the application of its program of quality control to manufacturers of ladies' sweaters, from 1956 through 1958, Bancroft's quality control group examined and passed upon sew-in labels, which are small woven or printed cloth labels placed in the back of the necks of the sweaters. This was done to insure that usage of Bancroft's trademark "Ban-Lon" was proper and that the licensee's own trademark was used in conjunction therewith. Hang tags used on ladies' sweaters were required to have the trade-mark "Ban-Lon" and the trademark or name of the licensee imprinted on the front of the hang tags.

57. Inspection of the plants of manufacturer licensees was made by Bancroft's quality control division on the average of two or three times a year.

58. In exercise of quality control under its program Bancroft's representatives made periodic, surprise inspections, called "swoops", of licensees' plants to examine the nature and quality of the garments being produced by the licensee for use with trademark "Ban-Lon" and to determine whether the licensee's current production conformed to the standards of the licensee's garments which had been approved by Bancroft.

59. Results of "swoop" inspections were reported to the head of Bancroft's quality control group, following which the results were reported to the inspected licensee. If inspection disclosed the licensee's sweaters met the standards approved, the licensee was so advised. If inspection revealed the sweaters were below standard in a minor aspect or if the sweaters found to be sub-standard were few in number, the licensee was informed of the deviation from standard and requested to make closer inspection of the garments. If inspection revealed a number of deviations from Bancroft's standards or if it was found that a number of garments in the licensee's plant failed to conform to the standards of the approved samples the licensee was usually informed in some detail of the findings and advised that the sweaters should be labeled "irregular" or the "Ban-Lon" labels removed. Such licensees were also advised that unless the conditions found to exist were corrected to Bancroft's satisfaction the licensees' position in the "Ban-Lon" program would be jeopardized and that withdrawal of permission to use the "Ban-Lon" trademark might result.

60. Garments purchased at random by Bancroft from retail sources were inspected and tested in its quality control laboratory to determine whether the

sweaters met the standards of the original approved submissions of that licensee. When it was found that garments so purchased did not meet such standards the licensee was so advised and requested to take immediate corrective steps.

61. From 1956 through 1958 Bancroft maintained a separate group of field service personnel, who worked with manufacturer licensees to assist them in any technical problems in meeting Bancroft's standards. This group's function was to provide technical assistance to trademark licensees and knitters with respect to problems involved in the use of continuous filament nylon yarn.

"Ban-Lon" yarn was unique in that it was knit under tension, that is, with the crimp pulled taut and, after knitting, the fabric so knitted was permitted to relax and the crimp allowed to recover before the fabric was cut and sewn into sweaters. Many manufacturers experienced in the production of garments from other yarns had had no experience with this yarn. Bancroft made no charge for its technical assistance.

62. The manufacturer licensees subject to inspection by Bancroft's quality control division were located in New York, Pennsylvania, Massachusetts, New Hampshire, in several other unidentified eastern states, in several mid-western states, in California, Canada and Puerto Rico.

63. As Bancroft's licensees increased, from 1956 through 1958, it gradually expanded its quality control program and the number of people employed in it. In 1956 Bancroft employed 7 persons who inspected or determined the quality of garments manufactured by its licensees. In 1957 it employed 10 persons and, in 1958, 25 persons, for the same purposes.

64. The number of end-product manufacturers licensed by Bancroft to use of its "Ban-Lon" trademark in the years 1955 to 1958, inclusive, was as follows: 1955—10; 1956—66; 1957—141; 1958—198.

The cumulative total of 415 licensees is without particular significance in determination of the extent to which additional burdens developed on Bancroft's quality control group, since the cumulative total, standing alone, is not too meaningful in the absence of evidence of the number of licensees who left the program during that period and of the number who submitted no samples for approval or of the number who, though submitting, received no approvals.

Change "Ban-Lon" to "Textralized"

65. In March 1958, through trade press media, Bancroft anounced that, effective April 15, 1958, the "Ban-Lon" trademark would be withdrawn from use on all yarn with certain exceptions not here material, and that the trademark "Textralized" would be assigned to replace it as the designation for yarn produced under the Bancroft license.

The announcement stated that the same quality standards which earlier governed the production of "Ban-Lon" yarn would now be applicable to all yarn carrying the "Textralized" mark. It further stated that the "Ban-Lon" trademark would continue to be used on garments, fabrics and other end-use items which were made from "Textralized" yarn and which met the standards of qualities specified by them by Bancroft.

It also stated that the change was made "to eliminate a certain amount of confusion and misunderstanding which resulted from the application of an identical trademark to both yarns and the many products made from it" and that "since a high-quality yarn does not necessarily produce a high-quality fabric or garment, we believe we should have one trademark for yarn which meets our standards, and a completely different one to designate garments and other products which are made from that yarn but required to pass an entirely separate set of quality and performance tests."

On March 26, 1958, Bancroft sent to its licensees a notice of the forthcoming change, with a reprint of the original news story.

On or about April 15, 1958, Bancroft sent to Shelley and its other manufacturer licensees formal notice that, effective April 15, 1958, the use of the "Ban-Lon" trademark was limited to fabrics and garments made of "Textralized" yarn meeting Bancroft's standards. Enclosed with the notice were new standards and procedures which became part of the licensee's trademark agreement and which included, inter alia, the earlier minimum stitch requirement of 28 stitches per inch for 70 denier, 2-ply "Ban-Lon" or "Textralized" yarn.

66. One of the major purposes of the withdrawal of the "Ban-Lon" trademark from yarn and its restriction to garments and fabrics, as pointed out by the Director of Bancroft's "Everglaze" Marketing Division to Bancroft personnel, dated March 5, 1958, was to "Remove from the market the manufacturer who wants to trade on the sales value of the 'Ban-Lon' name but refuses to make the kind of garment that will pass our standards" and who "* * * can make an inferior garment but label it as being 'made of 100% "Ban-Lon" yarn' ". He also said: "It is difficult to explain to the retail store buyer, and the consumer, the difference between a 'Ban-Lon' sweater and a sweater 'made of 100% "Ban-Lon" yarn' ", but made clear that under the new plan a "manufacturer can only identify a non-approved garment as being made of 100% "Textralized" yarn' ", thereby losing the value of association with the 'Ban-Lon' name."

67. No registration of the trademark "Ban-Lon" specifically for sweaters had been issued by the United States Patent Office to Bancroft before September 11, 1958.

Lansing Knitwear Problem

68. In late May or early June 1957, Bancroft approved a sweater sample submitted by Lansing Knitting Mills which had been submitted in April 1957 and which, upon re-examination after approval was issued, was found to have less than 28 stitches per inch.

69. On November 21, 1957, Bancroft believing that Lansing Knit Wear, Inc., was manufacturing and marketing under the "Ban-Lon" trademark Lansing's sweater styles 100 and 200 in a quality that was believed by Bancroft to be substandard, wrote to Lansing demanding that all such merchandise be recalled from stores and that all "Ban-Lon" identification be removed from the merchandise or that the labels be stamped "Irregular".

70. On December 20, 1957, as the result of a telephone conversation with counsel for Lansing Knit Wear, Inc., Bancroft examined its own records and found that one of the sweater styles of Lansing Knit Wear, Inc., had earlier been approved with 27 stitches per inch and concluded that its view that these sweaters were substandard, which was intensified by other problems with Lansing, was incorrect.

71. On December 26, 1957, Bancroft agreed with Lansing's counsel to waive its objection, theretofore stated, to the sale by Lansing of these sweaters in an amount fewer than 2,000 dozen.

"Swoop" Inspections and Aftermath

72. On September 10, 1957, Bancroft advised Shelley in writing that, while a number of submitted sweater samples carrying the "Shelley" and "Temi" labels were passable, a number of other sweaters submitted by Shelley for jobbers showed average stitch counts of 24, 25 and 26. When no reply was received from Shelley, Bancroft placed Shelley's name on a list for an early "swoop" inspection by one of its quality control inspectors.

73. A "swoop" inspection of sweaters in defendant's plant was made by Bancroft's Mr. Sinski on September 30, 1957.

74. Inspector Sinski's written report of his "swoop" inspection of September 30, 1957 disclosed that he inspected a total of 26 ladies' interlock sweaters 2 of which had an average stitch count of 24½ stitches or fewer per inch; 6 had an average stitch count of 25 stitches per inch; 7 had an average stitch count of

26 per inch; 6 had an average stitch count of 27 stitches per inch; 5 had an average stitch count of 28 stitches per inch.

The report did not disclose the volume of Shelley's inventory at the time, the dates of manufacture of the sweaters inspected or the number of stitches in the sample styles of the same sweaters which had been approved by Bancroft.

No significant weight is given this report in light of the following: No evidence was offered to establish how many dozens Shelley then had on hand of any of the styles inspected by Sinski. Additionally, analysis of the evidence shows that style 7010 was approved by Bancroft December 19, 1956 with a stitch count of 26 while the inspected specimens had average stitch counts of 28. Similarly, model 700 was approved by Bancroft April 26, 1957 with a stitch count of 26 while one of the specimens inspected had an average stitch count of 28 and the other an average stitch count of 27. Style 742, had been approved April 26, 1957 with a stitch count of 26, while the specimen inspected had an average stitch count of 28. To the contrary, model 204 had been approved October 7, 1957 with a stitch count of 28 while the specimen inspected had an average stitch count of 26. Similarly, model 101 had been approved June 12, 1957 with a stitch count of 29, while the inspected specimen had an average stitch count of 26. The evidence did not disclose approval by Bancroft before September 30, 1957 of certain of the style numbers inspected on the September 30 inspection, viz. No. 8379, No. 8329, No. 8111, No. 8949.

75. On October 10, 1957, as a result of the "swoop" inspection of September 30, Mr. Mersereau and Mr. Cooper of Bancroft visited Shelley's plant. During this visit, stitch counts were taken of finished sweaters and of fabrics in various stages of manufacture. Stitch counts of 26, 27 and 28 were disclosed.

At the conclusion of this visit, Mr. Ashe and Mr. Kozin, of Shelley, agreed to increase the stitch count so that the finished garment would have a minimum stitch count of 28 stitches per inch.

76. Vernon Wheat a Bancroft field service representative, who performed quality control inspections at times, made a "swoop" inspection of Shelley on February 21, 1958. The resume of this test had no significant probative value. While it disclosed that 13 of the 14 sweaters inspected had stitch counts of less than 28 per inch, it failed to disclose the style numbers of the sweaters inspected or the number of stitches per inch in the style sample which Bancroft had approved as the standard for that style, nor did it disclose how many dozens of the inspected styles were in Shelley's stock. It did not disclose whether or not the inspected sweaters were styles which Bancroft had earlier approved with less than 28 stitches and on which the approvals had not expired.

77. Following Wheat's February 21 "swoop" inspection, Bancroft wrote Shelley, on March 3, 1958, that Shelley's sweaters were, in many respects, substandard, and that unless Shelley corrected the situation within two weeks Bancroft would withdraw permission to use its Bancroft trademark and forward the matter to its attorneys for action. Bancroft indicated that the problem could be corrected by means indicated in the letter.

78. On March 7, 1958, Shelley replied to Bancroft's letter of March 3, complaining of Bancroft's failure to particularize the respects in which Shelley's sweaters were sub-standard and pointing out that "we are using 16½ cut equipment and our knitting is as tight as possible can set it (sic) without distorting body measurements."

79. On March 7, 1958, Mr. John Ashe of Shelley telephoned Mr. Cooper of Bancroft and expressed to him Ashe's indignation at the contents of Bancroft's letter of March 3 and told Mr. Cooper the nature of the contents of his written reply to Bancroft's letter.

Ashe also told Cooper that Shelley's samples of its 1958 production were to be submitted to Bancroft within a few days and that Shelley's machines had been set up to procure a minimum of 28 courses plus. Apparently, the forthcoming samples were those ordered by Mr. Kozin's directive of January 28, 1958 to sundry Shelley personnel. Cooper then told Ashe that he should not have written to Mr. Mersereau in the manner Ashe had indicated "because there will be hell popping". Cooper suggested that Ashe write him a letter, with a copy to Mersereau, repeating Ashe's oral statements about the forthcoming submission of Shelley's samples and indicating therein Ashe's expressed intention of setting Shelley's machines at 30 courses to obtain 28 courses plus.

Ashe adopted Cooper's advice and sent to Cooper the second letter of March 7 with a copy to Mr. Mersereau, who had written Bancroft's letter of March 3 to Shelley. In this letter Shelley indicated its intention to submit, within a few days, samples of Shelley's proposed 1958 production, "with increased courses", stating "it is our desire to build sweaters of 28 courses plus and have (sic) set up our machines to obtain 30 courses."

80. After Bancroft's receipt, on March 11, of Shelley's second letter of March 7, 1958, Bancroft took no action in furtherance of its letter of March 3 to Shelley, and Shelley took no steps in furtherance of its first letter to Bancroft of March 7th.

### Shelley's Late 1957 Problems and Aftermath

81. On December 12, 1957 John M. Ashe, Shelley's President, wrote a letter to Mr. Gordon Adams, President of Roselon Yarns, Inc., one of Bancroft's "throwster" licensees and Shelley's yarn supplier. Mr. Ashe therein expressed Shelley's concern over the loss of a valuable customer which had informed Shelley that it would have its garments made in Brooklyn from "Texturella" which it could purchase at $3.08 per pound as against the cost of $3.35 per pound for "Ban-Lon". Mr. Ashe also expressed concern about competitive tactics of some of his competitors and was critical of what he termed "quality control programs, shortages of 'Ban-Lon', improper people being licensed, etc." and "continuous propaganda which has not produced results." He voiced hope that "other end uses can be developed at once" because he felt "that the demand for 'Ban-Lon' in sweaters is not going to be there."

82. On December 12, 1957, John Ashe of Shelley sent also to Gordon Adams of Roselon Yarns, Shelley's yarn supplier, 3 sweaters made by a competitor of Shelley which Ashe had acquired from a jobber on a western trip, noting "that they have pilled badly". Ashe requested Adams to have them tested and analysed to determine the problem.

On December 23, 1957, Roselon sent the 3 sweaters to Bancroft indicating, however, that the sweaters "were returned to Shelley Knitting Mills because of pilling." On January 23, 1958, Shelley inquired of Roselon about the 3 sweaters indicating no report had been received from Roselon or Bancroft. On February 24, 1958, Shelley again wrote to Roselon about the 3 sweaters, indicating no reply had yet been received and its insistence on a reply because "it is a problem very important to us".

On March 12, 1958, Mersereau of Bancroft wrote to Roselon in apparent confirmation of an earlier telephone conversation, saying that "we have studied the Shelley sweaters which you sent to us." Mersereau pointed out that the 3 sweaters were very clear examples of why Bancroft was insisting that interlock garments made from 2-ply yarn have a minimum of 28 stitches per inch because each of the 3 sweaters submitted was below Bancroft's stitch count requirement by 2 to 4 stitches per inch; that the loose construction had allowed the filaments to be easily snagged and broken and that the garments submitted showed "rather bad fuzzing and pilling in service." A copy of Bancroft's letter to Roselon was sent to John Ashe of Shelley.

83. On December 12, 1957, John M. Ashe also wrote to several of Bancroft's executives inviting them to meet with him at Shelley's plant, suggesting December 30th or January 6th.

These letters voiced none of the concern, criticism or pessimism expressed in Mr. Ashe's letter of the same date to Mr. Gordon Adams; instead, Mr. Ashe stated "I would consider it a pleasure to show you a preview of next year's projections as well as our new styles. While the economic situation has become a bit soft the last quarter of this year, it is generally felt that 1958 will be a good year and we are making our plans filled with optimism and would welcome your views and comments when you are at our mill."

84. In response to Mr. Ashe's invitation Dr. Arnold Lippert, Bancroft's Vice-President, Mr. Lee Rainard, head of its quality control division, Frank Cooper, employed in its field service division, and Gorman Walsh representing its advertising division, visited Shelley's plant on January 6, 1958. They were met by John M. Ashe, Shelley's President, Allan Sommers who handled some of its advertising, Henry Korn, its sales manager and A. Gordon Adams, its yarn supplier.

85. At the January 6, 1958 meeting Mr. Ashe stated that Shelley had accumulated a large inventory of sweaters, which he represented to be approximately 40,000 dozen with a value, at cost, in excess of $1,000,000. He ascribed the accumulation to Bancroft's neglect, in his view, in doing a policing job on quality. Mr. Ashe indicated Shelley was considering a reduction of prices, disposition of its entire inventory and retirement from the "Ban-Lon" production. Mr. Ashe then proposed that Bancroft pay Shelley's factors the amount of interest which would accrue on Shelley's borrowings against its inventory until about June 1958 to enable him to retain the inventory for disposition at the beginning of the next season; that arrangement be made to enable Shelley to procure additional credit for yarn purchases to an amount between $200,000 and $300,000 and that Bancroft undertake a concentrated advertising program estimated by Mr. Ashe to cost approximately $100,000. Mr. Ashe spoke at some length, but Bancroft's executives made no commitments.

At this meeting Mr. Ashe made no complaint about or mention of Bancroft's minimum stitch count standard of 28 stitches per inch.

86. The amount of interest payable to Shelley's factors to extend the loans against Shelley's inventory from January to June 1958, inclusive, was estimated by Mr. Ashe to be approximately $51,000.

87. Before January 1958 Shelley had been a very substantial consumer of "Ban-Lon" and it was, therefore, to Bancroft's advantage that Shelley continue in business as a substantial consumer of that yarn and that the "Ban-Lon" sweater market should not be depressed by a dumping of Shelley's inventory at sacrifice prices.

88. On the day following the January 6, 1958 meeting Shelley sent to Bancroft a written statement of Shelley's inventory listing the style numbers and the numbers of dozens of each on hand. One sample of each sweater style listed was sent under separate cover.

The inventory disclosed a total of only 18,631 dozen. Of the styles listed on this inventory, Bancroft's evidence showed styles 101, 102, 103, 104, 105, 106, 107, 7000, 7002 and 7022 to have been approved by Bancroft for use with its "Ban-Lon" label. Shelley's evidence showed styles 7805, 509 and 110 to have been likewise so approved. No evidence offered by Bancroft or Shelley indicated prior approval by Bancroft, for use with its "Ban-Lon" trademark, of styles 1000, 1022, 2000, 2022, 7991, 7992, 7950 and 7952, of which styles the Shelley inventory listed in the aggregate, 1801 dozen, thereby reducing to 16,830 dozen Shelley's actual inventory of sweaters in styles approved by Bancroft—a notable difference from an inventory of 40,000 dozen stated by John Ashe one day earlier.

89. Twenty-one sweaters, forwarded by Shelley to Bancroft on January 7, 1958 as representative of the styles comprising its inventory, were received by Bancroft and placed, uninspected, in storage until March 3, 1958, when Bancroft returned them to Shelley after Shelley had billed Bancroft for them.

90. Some time after January 6, 1958 Shelley procured additional credit in excess of $300,000 from Roselon Yarns, Inc., its yarn supplier.

91. On several occasions between January 6 and April 23, 1958, Mr. John Ashe of Shelley and Mr. Rainard of Bancroft engaged in telephone discussions of Shelley's request to Bancroft for financial assistance to carry the former's inventory to June 1958. On one or more of these occasions Mr. Rainard assured Mr. Ashe Shelley's request was under discussion and consideration by Bancroft personnel.

92. In April 1958, prior to April 18, Mr. Rainard of Bancroft discussed with Mr. Gordon Adams of Roselon, Shelley's yarn supplier, Shelley's request for financial help in meeting the factor's interest charges for the period January to June 1958.

In this conversation Mr. Adams indicated that approximately $20,000 was needed to assist Shelley in the matter of its factor's interest charges and recommended that Bancroft contribute $15,000 and Roselon Yarns, Inc., the balance.

93. On April 18, 1958 Mr. Adams of Roselon wrote to Mr. W. R. MacIntyre, Bancroft's President, in veiled language and, omitting use of Shelley's name entirely, enclosed an invoice of Roselon to Bancroft for $15,000 for "Stabilization Program". The letter advised that Roselon was sending its check to the consumer, covering the amount Roselon was going to put up; that, if Bancroft made its check payable to Roselon, Roselon would send Bancroft a photostatic copy of Roselon's check for like amount made payable "to the party in question"; that, if Bancroft sent its check made out "to the concern", Roselon would see that it was turned over accordingly, unless Bancroft preferred to send it directly. The prospective but unnamed donee of the suggested check was, of course, Shelley.

On the same day, Mr. Adams wrote to Mr. John Ashe of Shelley as follows:

"In accordance with our factors' advice we are this day sending to them a check made payable to your company in the amount of $15,000. We are also enclosing our credit in the amount of $244.00 (copy of which was also sent to the factors). This, when added to the open item of $4,756.00 outstanding on your books in our favor, makes a total of $5,000.00; the sum total of the check and the allowances equal $20,000.00.

"In accordance with our verbal understanding, the purpose of this fund is to supply the necessary funds to help you in carrying out your decision to hold over your inventory from December through June; the understanding with you being that, in event you are able to successfully sell this inventory on a basis where your interest charges are fully covered, we may expect a return of the money in full. On the other hand, if for any reason, you are not able to realize your interest carrying charges on top of the cost of the inventory in question, you will return only to us that portion of the money representing the amount of interest covered at the time of the sale of the goods prior to July 25.

"If, for any reason, this is not in accordance with your understanding I would appreciate it very much if you would advise; otherwise you will please sign and return one of these copies for our files.

"We know that you appreciate this cooperative gesture on our part and are pleased to be of service to you in view of the business you have favored us with. We hope that this decision you have made in regards to your inventory will work out as successfully as you expect it."

94. Dr. Lippert, Bancroft's Vice-President, received a copy of Mr. Adams' April 18th letter to Mr. John Ashe of Shelley.

95. On April 23, 1958 Bancroft sent its check for $15,000, payable to Roselon Yarns, Inc., to Mr. Adams and requested that Roselon send Bancroft with a photostatic copy of Roselon's check in the same amount which "will be made payable to the firm in question" (Shelley).

On April 29, 1958, Roselon sent to Walter E. Heller & Company, Shelley's factor, Roselon's check for $15,000 payable to Shelley.

On May 7, 1958 Walter E. Heller & Company, Shelley's factor, sent Shelley a photostatic copy of Roselon's letter and advised Shelley that the proceeds had been used to reduce Shelley's inventory loan.

96. Bancroft never informed Shelley directly of its decision to advance the $15,000 or any other amount.

97. Mr. John Ashe of Shelley did not sign and return to Roselon's Mr. Adams, as suggested, a copy of Roselon's letter to Shelley, dated April 18, 1958, nor did Mr. Ashe ever make any written reply.

98. Bancroft's payment of $15,000 was its only contribution toward interest charges accruing against Shelley due to retention of inventory for the January –June 1958 period.

Bancroft's $15,000 Advance and Aftermath

99. At the time Bancroft advanced the $15,000 for Shelley toward factors' interest, Bancroft knew that Shelley had been experiencing difficulty in attempting, simultaneously, to adhere to Bancroft's minimum standard of 28 stitches per inch and to obtain in cutting from one strip of knitted fabric, pairs of ladies' sweater bodies in sizes 34 and 40 and in sizes 36 and 38, and was aware that Mr. John Ashe had complained of the difficulty of endeavoring to accomplish both economically.

However, Bancroft knew, at the same time, that Shelley had, at least by March 3, 1958, engaged Mr. Chas. Simon as an adviser and that Shelley had represented to Bancroft that "Mr. Simon and his associates will materially help ourselves produce the finest garments made."

Bancroft also had reason to rely then upon the statement to Bancroft in Shelley's letter of March 7, 1958 that "it is our desire to build sweaters of 28 courses plus and have set up our machines to obtain 30 courses. As you well know, it is our aim to create and upgrade the 'Ban-Lon' sweater market."

100. On April 25, 1958, Mr. John Ashe of Shelley specifically told Mr. Cooper and Mr. Wheat of Bancroft that Shelley could not economically make sweaters with a stitch count of 28 stitches per inch because it could not, while so doing, obtain sufficient width in the knitted fabric to enable it to obtain, by use of its cutting techniques, paired (a size 34 and a size 40) (a size 36 and a size 38) sweater bodies from one width of fabric.

Three days later, Shelley's Mr. Ashe and Sol Kozin visited Bancroft's Wilmington office and made the same complaint to Bancroft's Mr. Mersereau and Mr. Cooper.

Shelley endeavored at this time, without success, to secure from Bancroft a written rescission of the standard of a minimum stitch count of 28 stitches per inch.

101. By late April 1958 Bancroft had not supplied Shelley with, or offered to pay for, an advertising program.

On May 5, 1958, Shelley wrote to Bancroft about advertising and, having received no reply by May 20th, included in another letter of May 20th a reference to its May 5 letter. Bancroft replied on May 23, offering Shelley three alternative advertising proposals.

On June 12th, Bancroft indicated to Shelley that the only available advertising campaign was one of the alternative proposals set forth in Bancroft's letter of May 23.

102. On May 20, 1958, Shelley wrote Bancroft complaining, inter alia, of Bancroft's failure to reply to 17 of Shelley's

letters between October 26, 1956 and May 14, 1958.

103. On June 12, 1958, Bancroft replied to Shelley's May 20 letter advising Ashe that Bancroft had no record of the receipt of 9 of the letters complained about, and giving references to Bancroft's replies, by letter or telephone, to the remaining letters to which Ashe had referred. Bancroft then reiterated its position that it would not lower the minimum quality standards and was striving to see that the minimum standards were met wherever the "Ban-Lon" trademark was involved.

104. On July 31, 1958, five days after Bancroft had filed its complaint in this action, Shelley had on hand 21,867 dozen "finished" "Ban-Lon" sweaters (i. e. sweaters which had been knit, cut and sewed and were either in the process of being dyed, in greige or in the finishing or stock departments) of which 7,318 dozen were fully completed and ready for shipment. In addition, Shelley then had 7,040 dozen "Ban-Lon" sweaters in the "unfinished" state (i. e. knit, or knit and cut, or knit, cut and sewed, but not further processed).

On September 11, 1958, when the preliminary injunctive decree was entered by Judge VanDusen, Shelley had on hand 15,665 dozen "finished" "Ban-Lon" sweaters of which 4,467 dozen were fully completed, ready for shipment. In addition, Shelley then had on hand 3,349 dozen "Ban-Lon" sweaters in the "unfinished" state.

105. It was recognized, standard practice in the industry for manufacturers of "Ban-Lon" sweaters to retain sweaters in the "greige" until color directions were received from customers. The sweaters were thereafter dyed conformably to the customer's directions.

Shelley's Philadelphia Plant; Problems, Promises and Production

106. At all times now material, Mr. Sol Kozin was in charge of quality control at the Philadelphia plant of Shelley and made up the specifications for each style of sweater at the Philadelphia plant.

These written specification sheets were not produced by Shelley at the trial and were then unavailable because of loss or destruction.

107. Mr. Sol Kozin performed or supervised the performance of quality control testing thrice daily at Shelley's Philadelphia plant. Records of these daily quality control tests were made and kept at this plant, but the records were not produced at the trial and were then unavailable because of loss or destruction.

108. In October 1957, Bancroft discovered that Shelley was using improper labels, in that the labels failed to contain any other trademark than the trademark "Ban-Lon", further, that Shelley was using improper hang tags. Bancroft referred the subject to its counsel, who conferred with Shelley's Mr. Stanley Ashe and, in consequence, a letter agreement was executed by Shelley on November 22, 1957 in which it agreed to cease use of the unauthorized labels and hang tags, to deliver to Bancroft the unauthorized labels in Shelley's possession and to "in all other respects, abide by our agreement with you dated July 20, 1956". Shelley delivered the objectionable labels to Bancroft about January 27, 1958.

109. On or about January 28 1958, Sol Kozin issued a written directive to appropriate personnel at Shelley's Philadelphia plant for the production of 10 dozen sample sweaters in each of styles 404, 120, 405, 115, 408, 504, 609, 722, 700, 702 and 722X.

This directive, a copy of which went to John M. Ashe and Stanley Ashe, provided that all samples were "to finish to 28 courses plus per inch." The directive further indicated that Shelley must send to Bancroft "³⁄₁₂ each style with Deauville labels for quality control." The concluding line of the directive was as follows: *"These samples are important:* let us make sure they are PERFECT."

110. Mr. Kozin did not "expect" to produce sweaters for sale in these styles finished "to 28 courses" per inch, despite

the careful instructions in his directive of January 28, 1958 regarding the production of samples of these styles for submission to Bancroft which, upon approval, were intended by Bancroft to be the established standards for commercial production of these styles by Shelley.

111. On January 31, 1958, John M. Ashe of Shelley issued another directive ordering the production of other samples to be submitted to Bancroft for trademark approval. His directive to Shelley personnel ordered them to "make these up to finish 28 courses plus to the inch."

112. After January 28, 1958 Shelley, with the knowledge and under the supervision of Sol Kozin, continued to manufacture sweaters of "Ban-Lon" yarn with 26 stitches per inch in its Philadelphia plant.

113. Shelley, on March 3, 1958, recognizing that Bancroft had "rigid quality control" requested Bancroft to send to Shelley's consultant, Charles Simon, "a complete specification on 'Ban-Lon' sweaters that meet your quality standards. This will better help Mr. Simon better help us."

Later, in the same month, Simon came to Bancroft's Wilmington plant by appointment and had explained to him, in detail, Bancroft's quality control program and its requirements, including the minimum stitch count of 28 stitches per inch. The methods of Bancroft's tests were demonstrated to him on Shelley's sweaters which Simon had brought with him from the Shelley plant.

114. Under date of March 3, 1958, Shelley submitted to Bancroft 2 sweaters bearing the "Shelley" trademark and requested that they be extensively tested for color fastness, stability and "whatever quality test you may have." On March 13, 1958, Bancroft informed Shelley that the results of the tests on the 2 sweaters indicated that the sweaters were substandard in that the courses per inch averaged 25 instead of 28, that the shrinkage was excessive, that the sizing was below requirement, but that the garments were in other respects satisfactory.

115. Shelley wrote to Bancroft under date of March 11, 1958, stating, inter alia, "It is our desire to build sweaters of 28 courses plus and have set up (sic) our machines to obtain 30 courses."

The machines were not, in fact, then set up by Shelley to produce 30 stitches per inch in sweaters manufactured for sale.

116. No instructions were ever issued to Mr. Kozin or to Mr. Safdie or to Mr. Underwood to produce, at either the Philadelphia plant or the Homestead plant, sweaters having a stitch count of 30 stitches per inch.

117. Until 1957, the largest gauge knitting machine available for use in manufacturing sweaters was 16½ cut with a 30 inch diameter. In 1958 Shelley had 30 such machines. In 1957 or early 1958 improved knitting machinery became available with 18 or 18½ cut and with cylinder sizes larger than 30 inches. The new, improved machines made the operations on the pre-existing knitting machinery less economical and less practical.

118. In response to a request from John Ashe as to how Shelley could knit fabric with 28 stitches per inch and simultaneously get fabric of sufficient width to enable him to pursue his cutting techniques, Cooper and Wheat of Bancroft, as field representatives, visited Shelley's plant on April 25, 1958. They met with Ashe and Sol Kozin.

Ashe and Kozin indicated they were able to knit fabric which would finish 28 stitches to the inch, but that this did not give them the width they desired. Wheat recommended steam-stretching the fabric to obtain the desired width, then heat treatment to get and retain the stretch. Ashe rejected the suggestion as uneconomical. The problem, as presented by Ashe at this meeting, was not peculiar to "Ban-Lon" fabric, but was a problem of use of cutting technique in such fashion as to achieve minimum fabric waste.

119. The process of knitting "cut and sew" interlock sweaters of the type produced by Shelley involved knitting a tube of fabric with the "Ban-Lon" yarn under tension, i. e., stretched out and taut. The tube of fabric so knitted consisted of a series of strips called "blanks", each blank having a rib or cuff, an area of plain fabric, and a drawstring.

After knitting the blanks were separated and the fabric was processed to recover the crimp and bulk. The fabric was then smoothed, the sweaters cut therefrom, sewn together, heat treated to set in the stitch (known as thermosetting), dyed and finished.

As the knitting machine was adjusted to produce a higher stitch count per inch, it tended to reduce the diameter of the tube of sweater blanks. Wheat's recommendation of April 25, 1958 was calculated, inter alia, to compensate for the reduction in width by knitting a slightly longer sweater blank. It proposed that the crimp be allowed to recover, and that the blank would be steamed and stretched on a pair of spreader arms and thermoset using an autoclave.

The effect of this stretching was reduction of the length of the sweater body while increasing its width. By employment of this technique it was possible to obtain sweater blanks of sufficient width to accommodate Shelley's cutting techniques. The steam stretching process was inexpensive and was used in the industry in 1958. Shelley objected to the recommendation because it lacked thermosetting equipment and John Ashe was of the opinion that the proposed technique would require transportation of the fabric to a dye house twice, once for thermosetting and once for dyeing.

120. On May 14, 1958, Shelley wrote Bancroft, stating, among other things:

"It is impossible for us to meet your specifications and manufacture sweaters profitably or to make sweaters with your specifications and obtain correct sizes."

121. On the same date, May 14, 1958, Shelley, through Sol Kozin, wrote Bancroft, advising that two samples each of 34 different styles were being forwarded, under separate cover, for Bancroft's trademark approval, and representing that commercial production of the styles would, upon approval of the samples, be of 70/2 ply "Ban-Lon" yarn purchased from Roselon, dyed by Keystone Dyeing Company and made on 16½ cut machines.

122. On May 14, 1958, Shelley submitted to Bancroft for trademark approval the 34 style samples described in Shelley's letter of the same date. The 34 samples were tested by Bancroft and found to be of high quality. Of the 34 sweater styles submitted, 4 had stitch counts of 28 per inch; 3 had stitch counts of 30 per inch; 15 had stitch counts of 31 per inch; 11 had stitch counts of 32 per inch and 1 had stitch count of 33 per inch.

123. On June 9, 1958, Bancroft wrote Shelley and informed it that the tests on the garments submitted by Shelley on May 14, 1958 had been completed; that the sample sweaters, with two exceptions, met Bancroft's minimum specifications; that:

"Although the majority of the garments which you submitted in this group met our minimum specifications, we feel that we cannot issue official approval for them at this time as a result of the fifth paragraph in the letter of May 14 written to us by Mr. John Ashe which says in part, 'it is impossible for us to meet your specifications and manufacture sweaters profitably or to make sweaters with your specifications and obtain correct sizes.'

"If you would write us indicating that production of these submitted styles will be of a quality basically equivalent to the garments which you submitted to us and that the minimum size specifications which are attached will be met, we will at that time consider the matter of approvals for each of the styles submitted."

Shelley did not reply to this letter of Bancroft.

124. The sweaters manufactured by Shelley in its Philadelphia plant before April 11, 1957, and bearing the "Ban-Lon" trademark, were of good and marketable quality as were those so manufactured there by Shelley after April 11, 1957.

There was no evidence which disclosed the quality of the sweaters manufactured at Shelley's Homestead plant in Tennessee.

125. The machines in Shelley's Philadelphia plant were capable of producing sweaters with a minimum stitch count of 28 stitches per inch at any time after October 1, 1957.

Shelley, in fact, experienced no difficulty in having its machines knit 28 stitches per inch. It did experience difficulty, when knitting at 28 stitches per inch, in getting fabric of sufficient width to enable the cutting from one width of fabric sweater bodies paired in sizes 34 and 40 and sizes 36 and 38.

126. No officer or employee of Bancroft ever advised Shelley or its Mr. John Ashe that Shelley need not comply with Bancroft's standard of a minimum of 28 stitches per inch after its adoption.

127. During 1958 other trademark licensees of Bancroft met and exceeded Bancroft's minimum stitch count standard.

Shelley's Homestead Plant; Specifications, Production

128. Through the years 1956 and 1958, inclusive, Shelley operated a knitting mill at Crossville, Tennessee, under the name Homestead Knitting Mills, a separate corporation. The sweaters manufactured there through those years were sold through Shelley.

129. The Homestead plant at Crossville, Tennessee was operated under the direction of John M. Ashe, Shelley's President, and his son, Stanley Ashe.

130. Thomas C. Underwood was Resident Manager of the Homestead plant in Crossville, Tennessee from November 14, 1957 to October 26, 1958. During this period the daily quality control reports at Homestead were made either in duplicate or triplicate and one copy was always sent to Shelley's Philadelphia plant.

131. The daily quality control reports, made in the regular course of business at the Homestead plant, recorded the results of testing the cloth and actual garments made there. Among other things recorded was the number of stitches per inch in the finished body of the garment. All garments whose testings were so recorded were made of 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn. 12 knitting machines were in use there during the time here material, which were first numbered from 1 to 8, inclusive, and 13 to 16, inclusive. Later the machines were numbered from 1 to 12, inclusive.

132. The sweaters made at the Homestead plant were finished sweaters, except for dyeing and the addition of buttons. These sweaters were shipped either to Shelley at Philadelphia, or to the plant of Keystone Dyeing Works at Philadelphia pursuant to instructions received from Mr. John Ashe or Mr. Stanley Ashe.

133. The sweaters manufactured at the Homestead plant of Shelley of 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn, were made to be sold as finished garments under Bancroft's "Ban-Lon" trademark and Shelley's quality seal.

134. Between November 14, 1957 and October 26, 1958 the Homestead plant, operating 24 hours daily, 6 days per week, manufactured sweaters at the rate of 600 to 800 doz. per week.

135. Between April 15, 1957 and May 15, 1958, inclusive, Shelley submitted to Bancroft for approval approximately 78 sweaters. Of these submissions of Shelley to Bancroft approximately 55 had stitch counts of 28 or more, ranging as high as 32 stitches per inch.

On these submissions Bancroft issued 32 approvals of the submitted samples.

Of the 32 approvals 25 were of samples having a stitch count of 28 or more stitches per inch; 6 were of samples having a stitch count of 27 stitches per inch and 1 was of a sample having a stitch count of 26 stitches per inch, as follows:

Style No. 700 submitted 4–18–57, approved 4–26–57 with stitch count of 26, the approval being effective for one year.

Style No. 565/1 submitted 4–18–57, approved 4–26–57 having a stitch count of 27, the approval being effective for one year.

Style No. 725/6 submitted 5–6–57, approved 6–12–57 having a stitch count of 27, the approval being effective for one year.

Styles No. 101, 104 and 106 submitted 8–24–57, approved 9–19–57, having a stitch count of 27 each, the approvals being effective to 9–5–58.

Style No. 205, submitted 8–24–57, approved 10–7–57, having a stitch count of 27, the approval being effective for one year.

136. The sweaters manufactured in Shelley's Homestead plant between June 6, 1958 and July 3, 1958 included no styles which had been approved with a stitch count of less than 28 stitches per inch.

137. Between April 15, 1958 and April 22, 1958, a period of 6 productive days, machines numbers 1, 2, 3, 5, 6, 7, 8 and 11 consistently produced sweaters, daily, having a minimum stitch count of 28 stitches per inch or higher. Machines 4, 9, 10 and 12 produced sweaters having a stitch count of 28 stitches or higher on 5 of the 6 days and did not do so on one day.

138. Each of the 12 machines at Shelley's Homestead plant was capable of producing sweaters with a minimum stitch count of 28 stitches per inch.

139. On or about May 27, 1957 specification sheets were prepared, either at the Homestead plant, pursuant to instructions from Mr. John Ashe or Mr. Stanley Ashe, or were prepared by Shelley at Philadelphia and sent to the Homestead plant for style 731 in size 36–38; for style 731 in size 38–40; and for style 737X in sizes 34–40, 36–38. These specifications, which provided for 26 stitches per inch in the body of the finished sweaters in each style, were actually followed in the manufacture of sweaters at the Homestead plant from 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn.

140. On June 6, 1958, specifications were prepared, either at the Homestead plant pursuant to instructions from John Ashe or Stanley Ashe, or were prepared by Shelley at Philadelphia and sent to the Homestead plant for the manufacture of sweaters in styles 737X, 738 (size 40) 738 (sizes 34–40, 36–40, 38).

These specifications, which provided for 25 stitches per inch in the finished sweater in style 737X and for 26 stitches per inch in the finished sweater in the several sizes in style 738, were actually followed at the Homestead plant in the manufacture of the sweaters made from 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn.

141. Under date of June 17, 1958, written specifications were prepared, either at the Homestead plant pursuant to instructions received from Mr. John Ashe or Mr. Stanley Ashe, or were prepared by Shelley at Philadelphia and sent to Homestead for style 737X (size 34).

These specifications, which provided for 28 stitches per inch in the finished garment, were actually followed at the Homestead plant in the manufacture of sweaters made from 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn.

142. Between June 6, 1958 and July 3, 1958, inclusive, a period of 26 production days, the machines at Shelley's Homestead plant in Tennessee produced sweaters as follows:

Machines 1 and 6 produced sweaters having a stitch count of 28 stitches or higher for 7 days and sweaters having a stitch count of less than 28 per inch on 19 days.

Machine No. 7 produced sweaters having a stitch count of 28 per inch or high-

er on 8 days and produced sweaters having a stitch count of less than 28 per inch on 18 days.

Machines 2, 4, 5, 8, 9, 10 and 12 produced sweaters having a stitch count of 28 per inch or higher on 9 days and sweaters having a stitch count of less than 28 per inch on 17 days.

Machine No. 3 which was out of operation 1 day produced sweaters having a stitch count of 28 per inch or higher on 8 days and produced sweaters having a stitch count of less than 28 per inch on 17 days.

Machine No. 11 produced sweaters having a stitch count of 28 stitches per inch or higher on 8 days and sweaters having a stitch count of less than 28 stitches per inch on 16 days.

143. Between June 15, 1958 and July 3, 1958, inclusive, a period of 17 production days, every machine of the Shelley Homestead plant, except machine No. 3, operated during the 17 days and machine No. 3 operated 16 days. During this period not one of the machines produced a sweater with a stitch count as high as the required minimum of 28 stitches per inch. This production of sweaters was made from the same lot of yarn as those made from April 15 to April 22, 1958 and from June 6 to June 14, 1958, inclusive. These facts coupled with the quality control reports, prepared at the Shelley Homestead plant, establish that between June 15 and July 3, 1958 there was a continuous, uniform disregard of the minimum 28 stitch count standard in the manufacture of sweaters at the Shelley Homestead plant.

144. At its admitted production rate of 600 dozen to 800 dozen sweaters per 6 day production week Shelley, during the 17 days of manufacturing between June 15 and July 3, 1958, produced at its Homestead plant between 20,000 and 27,000 sweaters with stitch counts below the minimum standard of 28 stitches per inch.

145. On October 7, 1958, written specifications were prepared either at the Homestead plant pursuant to instructions from John Ashe or Stanley Ashe, or were made by Shelley at Philadelphia and sent to the Homestead plant for style 7022 (size 40) and style 7000 (sizes 38–40, 38, 40). These specifications which provided for 26 stitches per inch in the finished sweater in style 7022, for 25 stitches per inch in the finished sweater of style 7000 (size 38–40) and for 26 stitches per inch in the finished sweater of style 7000 (sizes 38 and 40), were actually followed at the Homestead plant in the manufacture of sweaters made 70 denier, 2-ply "Ban-Lon" or "Textralized" nylon yarn.

146. Shelley also used style numbers 622 and 722 to designate style 7022. It also used style numbers 600 and 700 to designate style No. 7000. Shelley used style 737X to designate a short sleeved model of style 737 or style 7037. It used style 738 and 7038 to designate the same style. Style 772 was also used to designate style 7072; style 770 to designate style 7070; and style 822 to designate as styles 509, 609 and 110.

Retail Purchases of Non-Conforming Styles

147. The continuing submission of samples of sweater styles by Shelley to Bancroft for approval after July 24, 1956 was a representation by Shelley that production of such styles by Shelley, upon approval of the samples by Bancroft, would be in conformity with the samples submitted and approved; and, a further representation by Shelley of its willingness to comply with the provisions of its written contracts with Bancroft.

148. On September 19, 1957, Bancroft gave written approvals for Shelley's use of the trademark "Ban-Lon" upon sweaters bearing, respectively, style Nos. 105 and 103 which had been submitted for approval by Shelley about September 6, 1957. Each had a stitch count of 28 stitches per inch. The approvals superseded any earlier correspondence concerning trademark approval of these styles and the expiration dates of these approv-

als were stated by Bancroft to be September 5, 1958.

149. On July 17, 1958, Bancroft's representative purchased at a retail store in New York a sweater manufactured by Shelley, bearing its trademark "Temi" and Bancroft's trademark "Ban-Lon", being Shelley's style No. 105. This sweater had a stitch count of 25 stitches per inch instead of 28 stitches per inch as in the approved sample model.

150. On July 21, 1958, Bancroft's representative purchased at a retail store in New York a sweater manufactured by Shelley under its style No. 105, bearing the trademark label "Temi" and Bancroft's "Ban-Lon" trademark. This sweater had a stitch count of 27 stitches per inch instead of 28 stitches per inch as in the approved sample model.

151. On July 17, 1958, Bancroft's representative purchased at retail in New York two sweaters manufactured by Shelley, bearing its "Temi" trademark and Bancroft's "Ban-Lon" trademark, designated Shelley's style No. 103–2. These sweaters had stitch counts of 26 stitches per inch and did not conform to the 28 stitches per inch in approved style No. 103 or the 29 stitches per inch in the earlier approved style 103–2.

152. On July 21, 1958, Bancroft's representative purchased at retail in New York a sweater manufactured by Shelley, bearing its "Temi" trademark and Bancroft's "Ban-Lon" trademark, being Shelley's style No. 103–2. This sweater had a stitch count of 27 stitches per inch and did not conform to the approved sample models 103 or 103–2 which, respectively, had stitch counts of 28 stitches and 29 stitches per inch.

153. On October 7, 1957, Bancroft issued written approval of a sample model submitted by Shelley under its style No. 207. The expiration date of the approval was fixed as October 7, 1958. The sample approved had a stitch count of 28 stitches per inch, and a chest measurement of 17.3 inches for size 36.

154. On July 17, 1958, Bancroft's representative purchased at retail in New York two sweaters manufactured by Shelley under its style No. 207, bearing Shelley's "Temi" trademark and Bancroft's "Ban-Lon" trademark. These sweaters had stitch counts of 26 stitches per inch as against 28 stitches per inch in the approved sample.

155. On May 7, 1957, Bancroft issued written approval of a sample submitted by Shelley under its style No. 7C5. The approved sample had a stitch count of 28 stitches per inch.

156. On July 17, 1958, Bancroft's representative purchased at retail in New York two sweaters manufactured by Shelley under its style No. 7C5, each bearing its "Temi" trademark and Bancroft's "Ban-Lon" trademark. These sweaters had, respectively, stitch counts of 25 and 27 stitches per inch.

157. On September 19, 1957, Bancroft issued written approval of a sample submitted by Shelley under style No. 7022. The approved sample had a stitch count of 28 stitches per inch.

On May 20, 1958, Bancroft issued written approval of another sample submitted by Shelley under its style No. 7022. The submitted sample had a stitch count of 28 stitches per inch. The letter of approval superseded any earlier correspondence concerning trademark approval of style 7022, but both approvals were to expire September 5, 1958.

158. On July 21, 1958, Bancroft's representative purchased at retail in Chicago a sweater manufactured by Shelley under its style No. 7022, bearing its "Shelley" trademark and Bancroft's "Ban-Lon" trademark. This sweater had a stitch count of 25 stitches per inch.

159. On July 21, 1958, Bancroft's representative purchased at retail in Boston two sweaters manufactured by Shelley under its style No. 7022, each bearing its "Temi" trademark and Bancroft's "Ban-Lon" trademark. These sweaters had stitch counts, respectively, of 25 and 26 stitches per inch.

Bancroft's Investment, etc.

160. During the period 1955 through 1958 Bancroft had built up and had a large, profitable business and good will in the products sold under its "Ban-Lon" trademark and had expended very substantial sums in the advertisement and promotion of the sales of knit goods, including sweaters, bearing the "Ban-Lon" trademark.

161. During the period from 1955 through 1958 Bancroft's trademark "Ban-Lon" was used extensively in interstate commerce throughout the United States by Bancroft and its licensees and was of very substantial value to Bancroft.

162. During the following fiscal years, which commenced July 1st, Bancroft expended the following amounts advertising its "Ban-Lon" trademark:

1955–$ 38,000; 1956–$185,000; 1957–$233,000; 1958–$591,000.

During the same period, fiber producers, yarns spinner licensees, garment producers and retail stores expended large additional sums in advertising the "Ban-Lon" trademark.

Suit by Bancroft, etc.

163. In late June or early July 1958 Bancroft determined to bring action against Shelley, but gave Shelley no notice of its intention.

164. In July 1958, at the request of Mr. Aurich of Bancroft counsel, Mr. Lee Rainard of Bancroft, without notice to Shelley, arranged a meeting in New York with Mr. Taylor, an officer of Associated Merchandising Corporation (A.M.C.), a substantial customer of Shelley.

Mr. Aurich told Mr. Taylor that he had heard rumors to the effect that Shelley had sold some 18,000 to 21,000 dozens of sweaters to A.M.C., and that Bancroft had evidence which led it to believe that the sweaters which Shelley was selling to A.M.C. were sub-standard. Mr. Aurich told Mr. Taylor that irreparable injury to Bancroft would result. At the time of this meeting Bancroft did not know when the sweaters then being sold by Shelley to A.M.C. had been manufactured by Shelley and had no reasonable grounds then for its belief that the sweaters then being sold to A.M.C. were not in conformity with samples theretofore approved by Bancroft.

165. Bancroft filed its complaint in the present action on July 26, 1958. Hearings on Bancroft's motion for preliminary injunction were held between August 12 and September 9, 1958. A preliminary injunction was issued on September 11, 1958. Shelley filed its appeal to the United States Court of Appeals for the Third Circuit on October 6, 1958. That Court on July 2, 1959 issued its order reversing the grant of the preliminary injunction and remanding the case to the District Court.

166. During the effective periods of the contracts between them Shelley never denied Bancroft's representatives any right of inspection of Shelley's plant or production.

167. Before it began this action, Bancroft had never withdrawn from Shelley the right to use the name "Ban-Lon" on sweaters which conformed to style samples submitted to and approved by Bancroft nor did Bancroft ever cancel its license agreements with Shelley.

168. Bancroft received no complaints from consumers about "Ban-Lon" sweaters manufactured by Shelley.

169. On August 28, 1958, after its suit had been instituted, Bancroft notified Shelley that approvals previously granted on styles which expired, respectively, September 5, 1958 and October 7, 1958 would not be renewed.

170. Shelley's sales under the trademark "Bon-Lon", of sweaters below the standards established by the style samples submitted to and approved by Bancroft did not cause irreparable injury to Bancroft and the evidence thus far has not established the extent of actual damage therefrom to Bancroft or to the good will of Bancroft's trademark "Ban-Lon".

Post-Suit Events, etc.

171. On December 28, 1959, under Cause No. 26,090, proceedings under Chapter XI of the Bankruptcy Act were

filed by Shelley in this court. In the course of these proceedings all of Shelley's assets, including all equipment, machinery and inventory, except a bookkeeping machine, were sold at public and private sale beginning in February 1960. The proceeds from the sale of Shelley's assets in the proceedings were distributed among its creditors.

172. During 1959 and the ensuing years Shelley has not manufactured or "jobbed" any sweaters bearing Bancroft's trademark "Ban-Lon".

173. Under Bancroft's licensing program no manufacturer can make and sell, and no jobber can deal in sweaters bearing the "Ban-Lon" trademark unless the manufacturer is licensed by Bancroft or unless the jobber is licensed as a jobber for a licensed manufacturer. Both Shelley's licenses with Bancroft and Bancroft's approvals for use of its trademark "Ban-Lon" have expired.

174. Shelley has not, at least since February 1960, been engaged in business and, through John M. Ashe, has expressed the intention never to engage again in the manufacture of sweaters under the "Ban-Lon" trademark. There is no evidence of any contrary intention.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of this action.

2. Bancroft was at all times here material, and still is, the owner of the trademark "Ban-Lon" and United States Trade-Mark Registration 621,848.

3. Bancroft has not abandoned its "Ban-Lon" trademark.

4. Bancroft has not lost its trademark "Ban-Lon" because of any failure or inability to exercise adequate control and supervision over its licensees.

5. The trademark "Ban-Lon" was not used by Bancroft in such manner as to deceive the public.

6. Bancroft's control over the nature and quality of the garments produced under its trademark "Ban-Lon" was sufficient to make the relationship between

Bancroft and its trademark licensees that of related companies within the meaning of 15 U.S.C. § 1055.

7. The minimum stitch count requirement of 28 stitches per inch was established in good faith by Bancroft.

8. The minimum stitch count requirement was not made for the benefit of Bancroft alone, but was made to improve the wearing qualities of garments bearing the "Ban-Lon" trademark.

9. Bancroft did enforce its standard minimum stitch count for sweaters after October 1, 1957 and can enforce its minimum stitch count standard against Shelley.

10. Bancroft did enforce its quality standards equally among its licensees and can now enforce those standards against Shelley.

11. Bancroft did not waive Shelley's compliance with Bancroft's quality standards.

12. Shelley, without Bancroft's consent, intentionally and knowingly manufactured, distributed and sold, in interstate commerce, ladies' knitted sweaters bearing Bancroft's trademark "Ban-Lon" at a quality differing from and inferior to Bancroft's standards and the standards of the garments submitted by Shelley and approved by Bancroft, and Shelley has thereby infringed the aforesaid trademark "Ban-Lon".

13. By its manufacture, sale and distribution of such sweaters, as aforesaid, without Bancroft's consent and approval, Shelley falsely implied and represented that such sweaters, bearing the label "Ban-Lon" and the hang tags attached thereto, had Bancroft's approval.

14. Sweaters manufactured, sold and distributed by Shelley, as aforesaid, though otherwise of good and marketable quality, did not meet the standards established by Bancroft for sweaters entitled to be sold under its "Ban-Lon" trademark, and the sale and distribution thereof constituted unfair competition.

15. Shelley breached the terms and conditions of the agreements between Bancroft and Shelley, dated July 24th, 1956 and August 30th, 1957, in that. it manufactured and sold, after October 1, 1957, sweaters which did not meet the standards prescribed by Bancroft 'and did not meet the standards of the style sample sweaters submitted by Shelley, and approved by Bancroft.

16. Assuming that Shelley was unable economically to manufacture sweaters with a minimum stitch count of 28 stitches per inch, such inability' gave Shelley no right to ignore or deviate from the standards established by Bancroft for use of its "Ban-Lon" trademark.

17. Bancroft is not now entitled to the injunctive relief claimed, because (a) no irreparable injury or damage has been suffered or is now threatened; (b) Shelley is no longer engaged in the manufacture of sweaters or other garments of any kind and is now without assets, machinery and equipment with which to engage in such manufacture; (c) Shelley's licenses and approvals from Bancroft have expired and Shelley is now without authority or license to use the trademark "Ban-Lon" ; (d) Shelley has indicated no intention to use, or to attempt further to use, the trademark "Ban-Lon" and has expressed a contrary intention; (e) this Court will retain jurisdiction of this action pending final determination of Bancroft's damage claims.

18. Bancroft is entitled to an accounting by Shelley for all profits received from sweaters manufactured and sold by Shelley which bore the "Ban-Lon" trademark, but did not meet Bancroft's standards and the standards of the style sample sweaters submitted by Shelley and approved by Bancroft.

ORDER

NOW, December 26, 1962, it is ordered that:

1. Bancroft's application for permanent injunction is, for the present, denied.

2. Pending final determination of Bancroft's claims for damages, jurisdiction of its claim for injunctive relief is retained.

3. Counsel shall, within one month, submit an appropriate order for an accounting by Shelley.