CROSSBOW, INC., and E. W. Gilson, Plaintiffs,

v.

GLOVEMAKERS, INC., Defendant.

No. 67 C 131.

United States District Court
N. D. Illinois, E. D.

March 8, 1967.

---

Hume, Clement, Hume & Lee, Chicago, Ill., Wood, Herron & Evans, Cincinnati, Ohio, for plaintiff.

Esther Kegan, Lawrence West, Chicago, Ill., for defendant.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### Plaintiffs' Motion for a Preliminary Injunction

Plaintiff Crossbow, Inc., operating under a license from plaintiff Gilson, manufactures and sells battery operated

portable signal lights carrying the registered trademark, DRINK-LITE. The signal light is a device which is adapted to be mounted on a drinking glass or cup. The act of mounting the signal light causes a light bulb within the device to be energized and to glow. Within a short time, the light bulb blinks on and off to signal that a refill is desired. The light also apparently can be utilized, when imprinted, as an advertising device. The plaintiffs' trademark is embossed upon the base of the signal light.

On or about January 19, 1967, defendant operated a display booth at the Housewares and Variety Exhibit in Chicago. The display admittedly featured several of plaintiff's DRINK-LITEs. Prospective customers apparently were told that the lights on display were samples, and that defendant would sell signal lights made in Hong Kong, which would have a slightly larger battery than the samples, at $4.40 per dozen. This price allegedly is approximately half of the distributor's price for DRINK-LITEs manufactured by plaintiff.

Alleging trademark infringement and unfair competition, plaintiff brings this action, in three counts, seeking preliminary and mandatory injunctions against the sale by defendant of any signal lights, and for an accounting of profits and damages arising out of the alleged use of plaintiffs' product and trademark. Today we consider only plaintiffs' request for a preliminary injunction.

Since the January 19th exhibition, defendant apparently has not again used plaintiff's product in connection with any selling endeavor or for any other reason. Defendant did not employ plaintiffs' product or trademark at another trade show held in Chicago on February 10, 1967, at the Knickerbocker Hotel. Defendant apparently intends to sell a signal light of somewhat different design than plaintiffs', apparently of inferior quality, and with the trademark THE BLINKER, which is in the process of being registered with the United States Patent Office. Defendant's order sheet,

and advertising material use the latter trademark. Also defendant asserts by way of affidavit, that all of the solicitations made during the January Housewares Exhibition were made under the descriptive legend "Blink Light", each customer was advised the light would differ in shape from the model, which was shown allegedly only to demonstrate the mechanical operation of a novelty light, and that no one was misled as to the source of origin of the goods to be delivered.

On the other hand, affiant Edward Berger, who visited defendant's booth at the show, testified, on plaintiffs' behalf, that he was told he could buy lights identical to the samples. Not until he pointed out the DRINK-LITE embossing was he told that defendant's lights would be slightly different than the models. In his opinion, if he had not inquired with particularity into the origin of the sample lights, he would have been left with the impression that the samples were identical to the intended Hong Kong import.

Plaintiff complains that by its use of the DRINK-LITE to solicit orders at the Housewares Exhibition, defendant violated the provisions of Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125 (a), which state:

"Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or the region in which said locality is situated, or by any person who be-

lieves that he is or is likely to be damaged by the use of any such false description or representation."

The result allegedly has been to divert business from plaintiffs, and create the likely prospect that plaintiffs' business, which consists of producing and selling only the single product, will be ruined. Plaintiffs concede that such a result would be proper if caused by legitimate competitive practices. But, they aver, defendant's practices were not legitimate and accordingly should be enjoined. This is because defendants have allegedly infringed plaintiffs' trademark rights, and have concurrently represented to customers the ability to supply a nearly identical signal light at a lower price, even though in fact such product will likely be of inferior quality.

Preliminarily, we deny defendant's motion to dismiss this cause for lack of jurisdiction. Section 43(a) is not applicable unless a person falsely describes, represents, or designates as to origin or otherwise, goods which enter into commerce. Commerce is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. Sec. 1127. Although the complaint does not allege the introduction by defendant of any signal lights into interstate commerce, we think the definition of that commerce which may be regulated by Congress is sufficiently broad to encompass the allegations contained herein.

■■ It is undisputed that plaintiffs sell DRINK-LITEs in interstate commerce. (See paragraphs 7 and 16 of the complaint.) We believe the jurisdictional requirement is satisfied if defendant's alleged activities, even if intrastate in character, adversely affect plaintiff's interstate business. That standard has been repeatedly followed. Pure Foods v. Minute Maid Corp., 214 F.2d 792 (5th Cir. 1954); Cole of California v. Collette, Inc., 79 U.S.P.Q. 267, 268 (D.Mass. 1948); Time, Inc. v. Life Television Corp., 123 F.Supp. 470 (D.Minn.1954);

Accord, Tiffany & Co. v. Boston Club, Inc., 231 F.Supp. 836, 841 (D.Mass. 1964); National Co-operatives, Inc. v. Petroleum Co-op System, Inc., 168 F. Supp. 259 (S.D.Ind.1958). Clearly the allegations of the complaint meet that burden, even if it is assumed that because the Housewares Exhibition took place in Chicago, defendant's alleged activities were purely intrastate.

■ Nonetheless, we think defendant's activities at the Exhibition involved the transaction of interstate business. We take judicial notice of the national and international exhibitors and customers present there. In our judgment, that fact alone creates the necessary involvement in interstate commerce which would sustain jurisdiction in this cause.[1] Defendant's motion to dismiss is denied.

■ We now turn to the motion for a preliminary injunction. Such a remedy is addressed to the discretion of the court. United States v. Corrick, 298 U.S. 435, 56 S.Ct. 829, 80 L.Ed. 1263 (1936). It is not a matter of right even though irreparable injury may otherwise result to plaintiff. See Yakus v. United States, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834 (1944). It should be granted only when the Court:

"is satisfied that there is a probable right and a probable danger and that the right may be defeated unless the injunction is issued; that the plaintiff is in substantial need of protection; and that the damage to him, if the injunction is denied, plainly outweighs any foreseeable harm to the defendant. As Judge Frank stated in Hamilton Watch Co. v. Benrus Watch Co. [2 Cir., 206 F.2d 738]:

'To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e. the balance of hardship tips decidedly toward plaintiff), it will ordinarily be enough

---

1. For an indication that notions of interstate commerce are expanding see e. g.

Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' "

7 Moore, Federal Practice, Par. 65.04 (1), p. 1627 (1966).

In this Court's judgment, it appears that defendant infringed upon plaintiff's rights at the Housewares Exhibition, in violation of Section 43(a) of the Lanham Act. Defendant's contention that no one was misled as to the origin of the product is unpersuasive, especially when coupled with affiant Berger's testimony regarding his visit to the defendant's booth. From what we have seen, it seems highly probable that prospective purchasers at defendant's booth expected to receive a product virtually identical to the DRINK-LITEs displayed there. To use plaintiffs' product and trademark for that purpose was wholly improper, in our judgment.

We think the conduct pursued comes squarely within the doctrine formulated by L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., 214 F.2d 649 (3rd Cir. 1954). In that case, defendant offered for sale a dress priced at $6.95. To advertise the dress defendant displayed a photograph of plaintiff's more expensive dress, the unstated assumption being, that the dresses were one and the same. Plaintiff was awarded relief under section 43(a).

L'Aiglon has been followed in many cases. In Zandelin v. Maxwell Bentley Mfg. Co., 197 F.Supp. 608 (S.D.N.Y. 1961), a preliminary injunction was granted because defendant used a photograph of plaintiff's product to advertise its own inferior product. The Court held:

"This section (Sec. 43(a)) applies where a defendant advertises its inferior and much cheaper product by featuring a photographic reproduction of plaintiffs' product, thus creates the impression that his product is precisely the same as plaintiffs' and causes

trade to be diverted from plaintiff to himself and other trade to be lost. L'Aiglon Apparel, Inc. v. Lana Lobell, Inc., supra." (197 F.Supp. at 611)

See also National Dynamics Corp. v. John Surrey Ltd., 238 F.Supp. 422 (S.D.N.Y. 1963); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956).

In the instant case, defendant displayed not a photograph of plaintiffs' product, but the product itself. Certainly, the apparent manner in which it was used should be violative of the principles enunciated in the line of cases following L'Aiglon. Section 43(a) is explicit in prohibiting the use of another's product to falsely represent one's own goods. From what has been presented to us we find it difficult to believe that defendant made an affirmative effort to inform all prospective customers of the origins of the DRINK-LITEs on display, and to point out the trademark embossed thereon, and its origins. The available evidence indicates that the use of DRINK-LITE by defendant tended to create the impression that defendant's cheaper and inferior product was precisely the same as plaintiff's. In our judgment, defendant's conduct was proscribed by section 43(a), so that plaintiffs are likely to prevail after trial of these issues.

Because defendant's conduct apparently violated the provisions of the Lanham Act, we find it unnecessary to consider the common law unfair competition charge of "palming off", *at this time*.

But whether such apparent wrongful conduct should warrant the imposition of a preliminary injunction proscribing all sales by defendant pending the outcome of this suit, is yet another question. The evidence indicates that the apparent wrongful conduct occurred only at the Housewares Exhibition. Plaintiff admits that since its product is not patented, it could have no objection to sales by defendant of THE BLINKER, which is of different design, and different proposed trademark than the DRINK-LITE. See Sears Roebuck Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661

(1964); Compco Corporation v. Daybright Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

Plaintiff argues that its remedy at law is insufficient and that all sales of signal lights by defendant should be enjoined. This theory is apparently based upon the holding in Ideal Toy Corp. v. Fab-Lu Ltd., Inc., 266 F.Supp. 755, S.D.N.Y., MacMahon, J., affirmed 360 F.2d 1021 (2d Cir. 1966), which stated:

> "The equities here all favor plaintiff, and it is quite probable that plaintiff will succeed upon the trial of this action on its claim under the Lanham Act. There is no feasible way for this Court to separate the sales which defendants will make as a result of their deceptive advertising from those they may make as a result of legitimate advertising. We must, therefore, enjoin all further sales by defendants of their 'Randy' doll in order to grant full and effective relief * * *"

See also Zandelin v. Maxwell Bentley Mfg. Co., 197 F.Supp. 608 (S.D.N.Y. 1961).

Plaintiffs' position is further based upon the belief that an injunction merely against filling orders taken on the basis of the use of plaintiffs' product and trademark would be inadequate. Plaintiffs suggest several methods by which such an order of court could be easily avoided.

Although both Ideal Toy and Zandelin provide authority upon which to issue a preliminary injunction against all sales of defendant's product, this Court is hesitant to do so. In both of those cases the defendants were circulating, at the time of the hearing, advertisements using photographs of plaintiffs' goods. Injunctions were issued to prevent misrepresentation as to the source of the product's origin. Furthermore, in Ideal Toy, the injunction was issued to stay defendant's activities because as the court stated, "the demand for dolls reaches its peak from now until Christmas."

The instant facts do not provide such a strong basis for staying the sale of signal lights by defendants. The major factor is the apparent cessation over a month ago of defendant's wrongful activities. The case law indicates that to issue an injunction as to prospective conduct when the offending activity has been discontinued prior to the hearing, is unusual. Autotyre Company v. Yagoda, 148 F.Supp. 447, 448 (S.D.N.Y.1957); Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 212 F.Supp. 715, 741 (E. D.Pa.1962).

Another factor which we believe distinguishes this case from Ideal Toy and Zandelin is that plaintiffs' relief under these circumstances, in our judgment, should properly be the subject of an accounting, and/or a preliminary injunction of lesser scope than that sought by plaintiffs. An injunction against any and all sales by defendant would have the harsh consequence of denying to defendant its right to sell signal lights. Plaintiffs conceded the defendant's legal right to sell THE BLINKER, at the last oral hearing on this matter. The Sears Roebuck v. Stiffel Co. case confirms that right.

Essentially then, we must balance two factors in making our decision—the harm to defendant in being denied the right to sell its product, against plaintiffs' probable difficulty in proving the amount of their damages via an accounting, and/or enforcing an injunction against filling orders taken as a result of defendant's wrongful conduct. Legitimately bearing on that decision are two further considerations. First, that defendant is seemingly present in court with "unclean hands" because of its apparent wrongdoing. Secondly, that defendant will suffer only relatively slight harm should an injunction issue, since signal lights allegedly constitute less than 1% of its business, whereas plaintiffs will possibly be financially destroyed if defendant is allowed to "ruin the market" by introducing an inferior product, since plaintiffs only manufacture and market one product—DRINK-LITE. Although defendant has a legal right to market an inferior product, for purposes of an injunc-

tive hearing, we must balance the equities. The relative size of the parties might be important, where as here, it is alleged that the larger company has acquired a share of the market for signal lights by improper means.

█ Conceding defendant's wrongful conduct, we do not think the difficulties faced by plaintiffs in proving their damages or in being protected by a less sweeping injunction would be insuperable. Were plaintiffs' product patented so that defendant could not so readily produce THE BLINKER, we would regard plaintiffs' position with far greater sympathy. But we cannot justify penalizing a competitor's legitimate rights, when plaintiffs' relief can be obtained in another manner, even though the difficulties in securing it might be more onerous than if an all-encompassing injunction were to issue. To protect plaintiffs against defendant's competition would be an extraordinary measure of relief in circumstances where the competitor has a bonafide right to compete. The public interest in a freely competitive society is important also when considering the propriety of issuing a preliminary injunction. See Yakus v. United States, 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834 (1944).[2] In considering the relief to be granted in enforcing the Lanham Act, we should hesitate to thwart the policy considerations underlying the remainder of our antitrust and patent law structure. To grant plaintiffs' requested relief would have that effect, in our judgment.

Furthermore, the need for the requested injunction is not as acute in the case at bar, as it apparently was in *Ideal Toy* and *Zandelin*. In both of those cases, the unlawful advertising occurred on many occasions up to the date of hearing, and presumably reached greater numbers of customers than were reached at the Housewares Exhibition, the only instance of defendant's apparent wrongful conduct. In those cases, the conduct might have continued until final disposition, had not preliminary injunctions issued. Here there is no such danger, for the offending conduct has ceased.

It is significant that last week, in a case filed in the District Court for the Southern District of New York, by the same plaintiffs against a different defendant, involving an infringement of the DRINK-LITE, and a situation comparable to the one at bar, Judge Motley refused to issue an injunction of the sweeping nature sought by the plaintiffs. Crossbow, Inc. v. Dan-Dee Imports Inc., 266 F.Supp. 335, S.D.N.Y., March 1, 1967.

█ Thus we think plaintiffs' request for a preliminary injunction against all sales of signal lights by defendant pending the determination of this action, should be denied.

However, we appreciate the difficulties of proof likely to ensue if we were only to enjoin defendant from filling orders taken on the basis of its wrongful use of plaintiffs' DRINK-LITE. Judge Motley apparently recognized these difficulties in the *Dan-Dee Imports* case also. She said:

"Since there is no feasible way for the court to separate the sales which defendants made as a result of their improper practices from those which were made as a result of legitimate practices, and since it further appears that improper practices were used in all sales because defendant did not have, nor does it now have any properly functioning working models of its own, the court must enjoin the filling of all orders for defendant's signal lights taken prior to the date of this decree."

Judge Motley issued a preliminary injunction, in essence prohibiting the defendant from selling its product BLINK-

---

2. Virginian R. Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937), quoted in *Yakus*, stated: "Courts of equity may, and frequently do, go much further both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

A-DRINK, through the use of, or by any representation concerning, the DRINK-LITE. In addition, and of major relevance to the instant case, defendant was enjoined from filling any orders for signal lights which were taken prior to the date of the injunctive order, and was required to notify all of the customers from whom those orders were taken, that it could not fill the orders, at least until such time as a final decision in the case was rendered.

The difficulty with an injunction of that nature when applied to this case, is that it inevitably would restrict defendant's legal right to sell its own product, since some of the orders taken were not procured by use of plaintiffs' DRINK-LITE. To adhere to Judge Motley's decision, by barring *all* of defendant's prior, orders, in this factual situation, would, we believe, unduly penalize the defendant for wrongful conduct which apparently occurred on only one occasion—at the Housewares Exhibition. In addition, the *Dan-Dee Imports* case is distinguishable from the instant case on its facts. The defendant there was guilty of wrongful behavior on a number of occasions, apparently continuing until the time the injunctive decree was issued. As stated by the court's opinion:

"defendant caused to be copied and manufactured in Hong Kong a 'Chinese' copy of plaintiffs' light. The initial copying was done with a unique degree of exactitude—even down to the recreation of plaintiffs' imprinted trademark and place of origin on the base. These copies were then sent to defendant in the United States for use as samples in various trade shows. Mr. Stern testified further that defendant exhibited these reproductions at several such shows after scraping off plaintiffs' trademark. The mark was still visible on close examination. None of the imported samples worked. To this day, defendant has not yet produced a properly functioning working model of its own. For demonstrations, defendant purchased a number of plaintiffs' lights from which the

trademark was imperfectly removed. When called on to give a working demonstration of its product defendant would use plaintiffs' lamps. * * *

* * * * * * *

Defendant's packaging for its product is different from that used by plaintiffs. Defendant has adopted the trademark *Blink-A-Drink* for its signal light. Language on the packaging other than the key trademark, however, is similar. Defendant admits that when artists designed his package, they had plaintiffs' package on hand. The important 'catchy' language on the packages is the same."

In a sense defendant's conduct in the instant case was more clearly violative of section 43(a) of the Lanham Act on the occasion when it was done, than in *Dan-Dee Imports*, because defendant used *DRINK-LITE*, itself for sample purposes, rather than a "Chinese copy" of same. But defendant used plaintiffs' product only on one occasion. Furthermore, defendant did not take orders under the name DRINK-LITE as did Dan-Dee Imports, or use similar packaging as the latter did. In our estimation, defendant's conduct, although wrongful, did not amount to the continuing pattern of deceit and intentional misconduct apparently pursued in *Dan-Dee Imports*. Judge Motley said:

"Here, defendant's copying of plaintiffs' product when combined with use of plaintiffs' product as a model, the copying of much of plaintiffs' packaging, acceptance by its salesmen of orders for *Drink-Lite*, plaintiffs' product, show acts and omissions likely to confuse and deceive customers as to the source of defendant's product. These acts evidence intentional conduct by defendant to 'palm off' its goods as those of plaintiffs and evidences a clear attempt to profit at the expense of plaintiff' * * *."

We do not believe the defendant's actions warrant such a severe penalty in this case. But some injunctive relief is justified. The remedy which we propose is to enjoin defendant from filling any

orders taken prior to the February 10 show at the Knickerbocker Hotel.

This solution too, will restrain defendant from filling some orders gotten as a result of legitimate sales activity. It will restrict to some degree, at least, defendant's legal right to sell its own product. But it also has the virtue of avoiding the difficult burden for this court of separating legitimate sales from wrongful ones. The February 10 cut-off date was chosen because it is clear that no wrongful sales were made at the Knickerbocker Hotel Show. There would be no way to establish with certainty that orders taken between January 19 and February 10 were not a direct or indirect result of the defendant's wrongful actions at the earlier show, particularly since defendant's mail order catalog, which specifically advertises "THE BLINKER", was unavailable until February 10.

In effect, although we will employ an arbitrary cut-off date, the solution which we have reached will best balance the equities herein, in our judgment. The injunction will not restrict defendant's prior sales as severely as did the decree in the *Dan-Dee Imports* case. This is just, because as we have indicated, the wrongful conduct was more harmful in that case. Certainly we should tailor the relief to fit the facts. On the other hand, it is manifest that defendant's wrongful conduct is the source of this lawsuit. We believe the loss to defendant of its sales of signal lights up to February 10, although a severe sanction, will not be a destructive blow in view of the percentage of sales which signal lights bear to defendant's total volume of sales from all products.

Accordingly, a preliminary injunction will issue restraining defendant from filling any orders taken prior to February 10, 1967.

In conformity with the provisions of Rule 65(c) of the Federal Rules, plaintiffs will post a security bond in the amount of $20,000.00.