**EBELING & REUSS CO.**

v.

**INTERNATIONAL COLLECTORS GUILD, LTD.**

Civ. A. No. 78–3073.

United States District Court,
E. D. Pennsylvania.

Dec. 6, 1978.

Arthur H. Seidel, Seidel, Gonda & Gold-hammer, Philadelphia, Pa., for plaintiff.

Robert W. Maris, Dilworth, Paxson, Kalish, Levy & Kauffman, Philadelphia, Pa., for defendant.

## OPINION

HANNUM, District Judge.

On September 19, 1978, plaintiff instituted the instant suit seeking, *inter alia* preliminary injunctive relief. The complaint alleges causes of action for common law unfair competition and unfair competition based upon § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The request for preliminary injunction was heard on October 20, 1978. The testimony having been transcribed and the parties having submitted proposed findings of fact and conclusions of law, the Court now makes its findings and conclusions, per Rule 52(a), F.R.Civ.P.

*The Facts.*

Plaintiff is a Pennsylvania corporation with its principal place of business in Devon, Pa. Defendant is a California corpora-tion with its principal place of business in Los Angeles. Jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331, 1338 and 1332, there being diversity of citizenship existing between the parties and the requisite amount in controversy.

Plaintiff is in the business of importing and distributing giftware, china and glassware. Its products are sold in interstate commerce and, locally, through retail stores in the Eastern District of Pennsylvania. Plaintiff's products are promoted at trade shows, by thirty salesmen, and through seventeen showrooms located in various parts of the United States. In addition, its products are advertised in trade publications, consumer magazines and through mailings to retail stores.

Since 1974 plaintiff's product line has included a so-called "fortune-telling" teacup and saucer set (the *Taltos* set), bearing distinctive symbols and characters that designate the various signs of the Zodiac. Included with each set sold is an instructional booklet of some twenty-one pages in length. A depiction of the *Taltos* set appears on the cover thereof. The set is manufactured by an English company, which has granted plaintiff exclusive rights to market the set in the United States. The set is not, however, protected by patent or copyright.

The *Taltos* cup and saucer are produced from what is known as "bone china," a high grade form of china, containing animal bone ash. The result is a characteristically white appearance to the product. Most recently, the set has been priced at $5.00, retail, a price set in September, 1978. This is contrasted with the previous suggested retail price of $10.00, which prevailed during the preceding months of 1978. Testimony at the hearing reflected that the *Taltos* set had been a stable item in plaintiff's line; that is, until recently, the demand for this item had remained at a relatively constant level over an extended period of time. In short, the set was not a trendy product, the appeal of which was merely of a few months' duration. As of the date of the hearing it was shown that the set was being carried by twelve retail stores in the Philadelphia area.

Alan Saxon, vice-president of defendant, testified at the hearing and stated that he first became aware of plaintiff's *Taltos* set in July, 1977, while in the course of preparing the American Archives Division of International Silver catalogue. The set was included in the catalogue, approximately one million copies of which were sent out to general members of the public who in the past had purchased merchandise from mail order catalogues.

Then, in January, 1978, Saxon and others formed the defendant company herein, and Saxon purchased several of the *Taltos* sets. His stated desire was to use these sets as models for manufacture of exact replicas, for ultimate sale to consumers. At least one set was sent to Japan and, allegedly, the Japanese manufacturer turned out a single exact copy of the set. However, due to trade restrictions it was unable to mass-produce quantities of the duplicates for export. Accordingly, the decal (i. e., painted design) on the cup and saucer was altered— per instructions from Saxon to make as few changes as possible—resulting in defendants' *Zarka* set.[1]

As of approximately April 22, 1978, Saxon was aware what the *Zarka* set would look like, having received an example from the Japanese manufacturer. Advertisements for the product began running in magazines of general circulation that same month. Included among these magazines were "Family Weekly," "Women's Day" and "House Beautiful." The advertisements depicted a cup set identical in appearance to plaintiff's *Taltos* set, and priced at $5.00 per set,[2] a price considerably lower than plaintiff's current suggested retail price for its own set.

Defendant would explain the similarity of appearance between plaintiff's set and the advertising depictions of defendant's set as follows: upon receiving the duplicate prototype from the Japanese manufacturer, defendant had it photographed. These photographs, it alleges, are the ones appearing in the advertisements, not photographs of plaintiff's *Taltos* set. Regardless, it was evident to defendant from April, 1978, onward that the *Zarka* set was not the same set shown in its advertisements and offered for sale. These same photographs have appeared in the advertisements ever since.

Not only is defendant's set not the same one depicted, but it is also composed of porcelain, an inferior grade material to the bone china of which plaintiff's cup set is composed. It is impossible to determine from merely looking at the advertisements what material makes up the *Zarka* set, and defendant makes no distinction between the grades, referring instead, throughout to its product being made of "fine china."

As opposed to dealing with the public through retailers, as plaintiff does, defendant deals directly with customers through mail order. Purchasers simply clip the coupons from defendant's advertisements and mail them to it. The *Zarka* set is one of three products marketed by defendant. Its inventory stands at 121,000 sets, out of total purchases of 210,000 sets ordered from its Japanese manufacturer. On the other hand, plaintiff sells a wide range of products. Its current inventory of unsold *Taltos* sets is approximately 17,000. Plaintiff's sales of its sets have dropped considerably since April, 1978.[3] Conversely, defendant's sales of its sets have increased dramatically over this same period.

1. Differences between the appearances of the two sets include the pictorial depictions of the Zodiac characters and the plaintiff's use of the actual signs of the Zodiac on its saucer, as opposed to defendant's use of the words designating those characters. A more detailed recitation of the differences is unnecessary, as the distinctiveness of each set is readily apparent to the average observer.

2. Saxon testified that, initially, the cup was advertised by means of a "split"; that is, in "Family Weekly," half of the advertisements

priced the cup at $7.50. The remainder were priced at $5.00 per set. There was some indication that the advertisements in "Women's Day" or "House Beautiful" also carried a price of $7.50 per set for a period of time, although it is undisputed that defendant's advertisements now uniformly carry a $5.00 price.

3. It appears more than coincidental to the Court that the April date corresponds to the introduction of defendant's advertisements in general circulation magazines.

It must also be noted that, although defendant knew as early as April, 1978, that its advertisements depicted a product that it could not deliver, defendant made no attempt to substitute a photograph of the *Zarka* set for the set actually shown. Defendant attempts to explain this by saying that the advertisements were placed well in advance of the magazines' issuance dates; therefore, they could not be changed. However, even giving the defendant a generous interpretation of the requisite "lead time" involved (at most three months, by Saxon's estimate), the advertisements could have been altered for the August, September and October, 1978 issues. We note that defendant's advertisement in the October, 1978, issue of "Better Homes and Gardens" does contain changes not reflected in prior advertisements. Specifically, this copy shows the inclusion of a picture of the instructional booklet accompanying each set purchased. The photograph of the set itself, however, remains the same. Accordingly, Saxon's testimony that the advertisements could not be changed is unconvincing.

Finally, on this score, we observe that defendant was not without notice that its advertisements were misleading to customers. Saxon, himself, testified that defendant had received complaints from several purchasers that the sets they received in response to defendant's advertisements were not the same as the sets depicted.

One further factual matter requires discussion, that is, the question of laches. Concerning this issue the Court finds that plaintiff first became aware of defendant's *Zarka* set in April, 1978, when one of plaintiff's salesmen forwarded to the main office a copy of one of defendant's advertisements, which had appeared in "The Sunday Philadelphia Bulletin." Plaintiff then wrote to its English manufacturer to ascertain whether it had authorized anyone else to market the *Taltos* sets in the United States. Upon learning that it had not, Allen Goeldner, plaintiff's vice-president, requested that one of his office secretaries order a *Zarka* set from defendant. This she did on May 19, 1978. The cup set was received in late June, 1978. Included with the set was an instructional booklet, the contents of which are virtually verbatim of plaintiff's booklet, and bears a photograph of the plaintiff's *Taltos* set. Goeldner testified that he, personally, next began noticing advertisements for defendant's product in general circulation magazines in approximately August, 1978. Suit was commenced here on September 19, 1978.

### The Law.

In determining whether a preliminary injunction shall issue in a case such as this, the Court must consider whether there has been an adequate showing of (1) probability of ultimate success on the merits, and (2) irreparable injury *pendente lite* if the injunction is not granted. The applicant for such relief, of course, bears the burden of establishing each of these elements. *Chips 'N Twigs, Inc. v. Chip-Chip, Ltd.,* 414 F.Supp. 1003, 1012–13 (E.D.Pa.1976). In addition, the Court should also take into account the traditional equitable consideration of the public interest involved, an interest particularly strong in cases such as these. Given these basic guidelines, we turn to the case before the Court.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that:

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situat-

ed, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

Essentially, plaintiff contends that it competes with the defendant for customers of "fortune-telling" teacup sets and, that as a result of defendant's depiction of plaintiff's *Taltos* set in its advertisements, potential customers will be deceived into believing defendant's inferior-quality, lower-priced *Zarka* set is the same as plaintiff's. Plaintiff characterizes the use of the photographs as "false descriptions or representations," in violation of § 43(a) of the Lanham Act. As a result, plaintiff claims, among other harms, lost sales and loss of control over the goodwill associated with its *Taltos* set.

■ Initially we note that even though plaintiff's product is not patented or copyrighted, and thus may be copied at will by others, *Crossbow, Inc. v. Dan-Dee Imports, Inc.*, 266 F.Supp. 335 (S.D.N.Y.1967), this fact alone does not preclude relief in a suit based upon the Lanham Act for unfair competition. *See, e. g., Ames Publishing Co. v. Walker-Davis Publications, Inc.*, 372 F.Supp. 1 (E.D.Pa.1974). Accordingly, the Court may entertain a request for the relief plaintiff here seeks.

■ It is perfectly clear from the evidence presented that defendant has depicted in its advertisements a product that is apparently the same, if not identical, in appearance to plaintiff's cup set. It is equally clear that the *Zarka* set, that is, the set actually sold by defendant in response to orders placed, is not the set depicted in its advertisements. Moreover, the *Zarka* set is inferior in quality to plaintiff's product and, until most recently, priced to retail at a significantly lower value. Under these circumstances, plaintiff has made the requisite showing of ultimate success on the merits of its Lanham Act claim. *L'Aiglon Apparel, Inc. v. Lana Lobell, Inc.*, 214 F.2d 649

(3d Cir. 1954); *Crossbow, Inc. v. Dan-Dee Imports, Inc.*, 266 F.Supp. 335 (S.D.N.Y. 1967); *American Optical Co. v. Rayex Corp.*, 266 F.Supp. 342 (S.D.N.Y.1966); *Ideal Toy Corp. v. Fab-Lu, Ltd.*, 261 F.Supp. 238 (S.D.N.Y.1966); *National Dynamics Corp. v. John Surrey, Ltd.*, 238 F.Supp. 422 (S.D.N.Y.1963).

Defendant makes much of the purported fact that it had produced a prototype identical in appearance to plaintiff's product, photographed the prototype, and then ran that photograph in its advertisements. The testimony on this point, however, is not persuasive in view of the fact that neither at the time of the hearing or at any time subsequent has defendant produced the prototype or the photograph thereof.[4] *Cf. American Optical Co., supra.* Moreover, even had defendant produced the prototype or the photograph thereof, this fact alone would not alter the decision of this case. This must be so because the advertisements do not depict the cup set actually sold by defendant; rather, they show plaintiff's *Taltos* set. This, in itself, is a false description or representation, actionable under the Lanham Act. *Cf. Scoville Manufacturing Co. v. Winnie Mae Manufacturing Co.*, 195 U.S.P.Q. 155 (C.D.Cal.1976). *See also, American Optical Co., supra,* at 344.

Concerning the irreparability of the harm plaintiff will suffer *pendente lite* should an injunction not issue, we find that this would include a loss of sales, the value and extent of which it is impossible to accurately ascertain. *Crossbow, Inc., supra.* As well, we find that plaintiff will suffer the loss, damage or loss of control over the goodwill associated with its *Taltos* set. *Knoll International, Inc. v. Continental Imports, Inc.*, 192 U.S.P.Q. 502 (E.D.Pa.1976); *Tefal, S.A. v. Products International Co.*, 186 U.S.P.Q. 545 (D.N.J.1975), *aff'd,* 529 F.2d 495 (3d Cir. 1976). All of these harms have been demonstrated by plaintiff. We think it important at this juncture to reemphasize that

---

4. Defendant did produce a receipt for certain photography work performed (Defendant's Exhibit # 1); however, absent the prototype or the photograph thereof it is impossible for the Court to determine whether the prototype (if such exists) or instead plaintiff's *Taltos* set was photographed.

plaintiff was the sole seller in the United States of the *Taltos* set, a set which it alone had marketed since 1974. Under these circumstances it would be grossly unfair to permit the defendant to obtain a free competitive ride by utilizing photographs of plaintiff's cup set to market its own inferior set.

■ Furthermore, we here weigh the public interest involved. Necessarily, we consider the important public interest in a freely competitive society. *Crossbow, Inc. v. Glovemakers, Inc.*, 265 F.Supp. 202, 208 (N.D.Ill.1967). Nevertheless, if the probability exists that this interest is not being forwarded; but rather, that the public is being deceived by defendant's actions, this factor weighs strongly in plaintiff's favor. The Court is aware of cases holding that the plaintiff need not show that the public has actually been deceived; i. e., that the likelihood of confusion will suffice. *See, e. g., CBS, Inc. v. Gusto Records, Inc.*, 403 F.Supp. 447 (M.D.Tenn.1974); *Ames Publishing Co., supra*. However, in this case plaintiff has demonstrated more than a mere likelihood. Testimony from defendant's vice-president, Saxon, showed that several purchasers had, in fact, been deceived by defendant's advertisements.[5] Accordingly, we find the public interest favoring the grant of preliminary injunctive relief.

As to the balance of the hardships, this too, tips in plaintiff's favor. Considering the cost of plaintiff's *Taltos* sets arriving from England ($3.05), and the price at which plaintiff has been forced to sell its inventory to meet defendant's competition ($2.50, wholesale to its distributors), plaintiff suffers a loss of $.55 on each set. Defendant, on the other hand, is able to profit considerably on each *Zarka* set it sells. In addition, we emphasize the defendant's total failure to modify its advertisements since April, 1978, when it learned it could not supply the cup set depicted in its advertisements.

Finally, we turn to the question of whether plaintiff has been guilty of laches. The Court is satisfied that it was not. We find that the hiatus of less than three months between the time plaintiff first learned of defendant's advertisements and the date suit was filed was not inordinate and, therefore, does not bar the relief sought.

In summary, the Court finds that the plaintiff has shown:

(1) a probability of ultimate success on the merits;

(2) a probability of irreparable injury *pendente lite* should a preliminary injunction not be granted;

(3) that the public interest would be forwarded by granting the requested relief;

(4) that the balance of the hardships favors plaintiff; and

(5) that the plaintiff is not guilty of laches.

### Scope of Relief.

Having determined that plaintiff is entitled to a preliminary injunction, we next consider the question of its scope. It is clear to the Court that defendant must be prohibited from continuing to run advertisements that directly or indirectly depict plaintiff's *Taltos* set. While the defendant may prepare and cause to be circulated new advertisements depicting the *Zarka* set, it will be barred from continuing, or causing to continue, the circulation of the offending advertisements, or similar advertisements.

Likewise, it is clear that defendant should be required to segregate all of the orders for *Zarka* sets filled to date, so that when this action is ultimately tried on the merits the Court will be able to more easily ascertain the sales attributable to the advertisements in question.

---

**5.** In this connection we parenthetically note that plaintiff need not show that the purchasing public knew that the cup set depicted in defendant's advertisements originated with plaintiff. The so-called "single source rule" was not written into the Lanham Act. *Zandelin v. Maxwell Bentley Mfg. Co., Inc.*, 197 F.Supp. 608 (S.D.N.Y.1961); *L'Aiglon Apparel, Inc., supra*.

Third, defendant must be restrained from filling any unfilled orders, received as a result of the advertisements, with *Zarka* sets.

Finally, as to each unfilled order for *Zarka* sets, which is resultant from the advertisements in question, defendant should be required to refund any monies received with such orders, and to notify each customer involved that (1) the *Zarka* set is not the same set as is depicted in the advertisements, but rather is the *Taltos* set distributed by plaintiff, and (2) that it is unable to fill such orders with *Zarka* sets.

The foregoing shall constitute the Court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

An appropriate Order will be entered.